# West Republic Mining Company *versus* Jones & Laughlins.

1. Although in Pennsylvania a sale by sample is a guaranty only that the article to be delivered shall follow its kind and be merchantable, yet a stipulation that future deliveries will equal the sample, may become a term of the contract and be enforced as such. It is then unnecessary to determine whether the stipulation is a warranty or a condition.

   Wetherill *v.* Neilson, 8 Harris 448, distinguished.

2. A contract provided for the delivery of 5,000 tons of ore at $10 per ton, the buyer to pay for a certain number of tons per month, but contained no stipulation as to the number of tons to be delivered each month or when the delivery should be completed. Under the contract the first payment was made before any ore was delivered; and certain future payments were withheld, on the ground that the quality of the ore was inferior, not that the payments had not become due by reason of non-delivery of ore.

   *Held*, by virtue of the terms of the contract and the conduct of the parties, that the contract was entire.

3. A contract for the purchase of iron ore provided, that the quality thereof "should be up to the sample car load sent us;" and it appeared that the purchasers were induced to receive and test the sample car load upon the representation that it was equal to the best ore from a certain other mine.

   *Held*, that if the ore delivered under the contract was inferior to the sample car load, this fact could not be shown by comparing the former with ore from the other mine.

[Mining Co. *v.* Jones.]

4. Chemical analysis of ore received under the terms of a contract may be admitted in evidence, although no chemical analysis of the sample, which the ore was stipulated to equal, has been made.

5. To determine the value of ore which has been found unfit for the uses for which it was sold, evidence is admissible to show its unfitness for other purposes.

6. The legal measure of damages, when inferior ore has been furnished, is the difference between the contract price of the ore and the market value.

7. When shipments have been received without any protest by the buyer, or inducements by the seller, the dates for estimating the market price are the dates when the shipments were received.

8. Interest should be allowed in all cases of contract where it is the duty of the debtor to pay money without a previous demand by the creditor. A bona fide dispute as to the amount of the indebtedness is no bar to the accruing of interest, and if a tender of payment falls short of the sum found to be due at the time of the tender, interest runs on the whole.

9. Under the circumstances of this case it was error to admit in evidence exhibits taken from an unculled pile of ore, more than a year after the last delivery under the contract.

November 7th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas No. 2 of *Allegheny county :* Of October and November Term, 1884, No. 177.

Assumpsit, by the West Republic Mining Company against Jones & Laughlins upon a contract for the sale of iron ore.

On the trial, before WHITE, J., the following facts appeared : On January 18th, 1882, Rhodes & Co., who represented the Mining Company, sent the defendants the following letter :

" We would like to send you a car or two of West Republic ore, to try for fix ; it is equal to the best Old Rep. ore, and although the price is the same, we think you will be better pleased to have two places to buy this grade of ore. Can sell you 3,000 tons for 1882 delivery at $10.00 cash."

Also the following, on February 6th, 1882 :

" As soon as you have tried the West Republic ore would like to hear from you. Are holding 5,000 to 6,000 tons for you for fix."

A car load of ore having been sent to defendants and found satisfactory, they wrote plaintiffs as follows :

" PITTSBURGH, February 16th, 1882.

Messrs. Rhodes & Co., Cleveland, O.—*Dear Sirs :* We have tried the West Republic ore lately sent us and find it satisfactory. We will take five thousand (5,000) tons at ten dollars per ton at Ashtabula ; payments to be made for 500 tons

per month, beginning in May next. And we will advise you from time to time as to which road to send it by. Quality of ore to be up to the sample car load sent us.

Very truly yours,

JONES & LAUGHLINS."

The offer made by this letter was accepted by the plaintiffs in writing and formed the contract in dispute. The contract was assigned to Laughlin & Co., and the first payment on account was made in May, 1882, before any shipment of ore was received.

The ore first delivered was inferior to the sample car load, and the defendants ordered the shipments to cease until further notice, and formally protested against the quality sent. But upon explanations and assurances by plaintiffs, the shipments were ordered to be resumed until 500 tons, the amount paid for in advance by the May instalment, were delivered. This second delivery of ore was also inferior, and reasonable notice thereof was given to plaintiffs. No ore was shipped, during the summer, owing to a strike at Laughlin & Co.'s works, and when the June and July payments were demanded, defendants refused to meet them, defining their position by their letter of July 31st, 1882, as follows: " . . . . . While Laughlin & Co. do not decline to receive the ore contracted for, they are justified, under the circumstances, in declining to make payment for it, until it has been received and found to be equal to the best Republic Iron Company's ore, as contemplated, and in having it understood that no more will be received or taken off the cars which is not fully up to this standard. . . . . . "

The remainder of the correspondence during the summer consisted, on the part of the plaintiffs, in demands for payment and assurance of the future good quality of the ore, and on the part of the defendants, in refusals to pay until the ore had been received and inspected. But by their letter of September 30th, 1882, the defendants wrote that they would make another trial of the West Republic ore, and ordered shipments to be begun. The plaintiffs replied in letter of October 3d, 1882: "We will forward the ore and will give you what we contracted to do: No. 1 West Republic ore." Ore was accordingly delivered in October and November, and shipments paid for respectively November 7th and December 7th. From the time when delivery was resumed, early in October, until January 9th, 1883, no complaint was made of the ore received, but plaintiffs were repeatedly urged to "forward their shipments before freezing weather." On the latter date, however, the defendants wrote, "we have been working the West Republic ore for the past month, and find

that the yield of iron is very unsatisfactory. . . . . . Instead of being a first class ore, as represented, it does not yield in the furnace equal to second class ores previously worked in the same furnace. You will therefore stop all shipments of the ore. . . . . . We will be pleased to hear from you in regard to what disposition you will make of the ore here, as we cannot use it unless the price is reduced to correspond with quality."

At this time December and January shipments amounting to about $5,000 were not paid for, and about 1700 tons contracted for were yet to be delivered.

Suit was then brought against Jones & Laughlin to recover the contract price of the ore delivered for which no settlement had been made, and for damages sustained by the failure to complete the contract, the market price of ore having fallen.

The defendants offered to show by James Laughlin, " That the plaintiffs proposed to have the firm to which witness belonged, become a purchaser of the ores of the plaintiff company ; that, in order to induce them to become so, plaintiffs represented to the witness that said ore was equal to the best Old Republic, being an ore of the highest quality known to the trade, and, as such, previously used by the defendants ; that, in view of said representations, the defendants agreed to try the new ore if a sample car load should prove satisfactory ; that a sample car load was sent to and tried by defendants, who found the quality of it to be as represented ; that, accordingly, the letter of February 16th, 1882, was written by defendants and accepted by the plaintiffs. To be followed by evidence that the ore subsequently sent by the plaintiffs to defendants proved to be greatly inferior in quality to that sent in the sample car ; that defendants notified plaintiffs of this fact ; that plaintiffs admitted such inferiority and promised to correct it in the ore subsequently to be furnished ; that said ore subsequently sent continued to be inferior in quality to the standard lot ; that defendants, finding such to be the fact, declined to continue to receive said ore, and notified the plaintiffs to take away the ore previously sent. The purpose of the offer being to show the circumstances under which the purchase and sale in question were made, and the failure by the plaintiffs to comply with the terms of their agreement."

Objected to by plaintiffs, " First. Because all negotiations, representations, expressions of opinion and the like, preceding the making of a written contract, such as that sued on, are merged in the contract, and are not competent to be shown to vary its terms.

Second. Because the plaintiffs' obligations, whatever they may be under the contract, cannot be enlarged by parol.

Third. Because representations or expressions of opinion constitute no defence to an action to recover the price of goods sold and delivered in the absence of an express warranty.

Fourth. Express warranty cannot be added to a contract in writing by parol. It must be found in the contract itself, and there is none such in the contract sued on.

Fifth. So much of the offer as relates to ore furnished prior to December 1st, 1882, is inadmissible, it being conceded that all ore delivered prior to that time was accepted and paid for by the defendants. It is too late after such acceptance and payment to deny the correspondence of the ore with that contracted for.

Sixth. The testimony offered is incompetent and irrelevant.

Seventh. The testimony offered is insufficient in law to give the defendants any rights of rescission."

By the court: "The offer is substantially to prove that the plaintiffs agreed to furnish ore equal in quality to that of the sample car, and the ore furnished was inferior. I think it is admissible thus far." Exception. (First assignment of error.)

Defendants called one E. L. Wood, to whom they propounded the following question:

"Q. Referring to ore of the quality of the sample car which you tried and said you found satisfactory, and ore of the kind you tried in June, what in your judgment would be the difference in value of such ore by the ton?"

"Objected to for the reason that in the first affidavit of defence filed by the defendants, the measure of damages is fixed by themselves, and under the rule of court the defendants are confined to the proof of such matters of defence as are contained in the affidavit of defence. If this question is intended to elicit a reply inconsistent with the measure of damages fixed by the affidavit of defence filed, the testimony is incompetent and irrelevant under the rules of court. Further, it is not competent to prove upon a question of damages, the differences of value by the opinion of a witness as an expert—the legal measure of damages being the difference in market price." Objection overruled and evidence admitted. Exception. (Second assignment of error.)

Otto Wuth, a witness called by defendants, was asked:

Q. Were you at any time requested by the defendants, Jones & Laughlins, to make an analysis of West Republic ores?

A. Yes, sir.

Q. And when was that?

A. I have a memorandum of it. (Witness consults memorandum.)

Plaintiffs' counsel objects to any testimony as to chemical analysis of ores, unless for the purpose of comparison between the ore contained in the sample car, so-called, and the ore subsequently furnished by the plaintiffs, and to any testimony as to a chemical analysis of the ore subsequently furnished, in the absence of testimony, also, of a chemical analysis of the ore contained in the sample car. Objection overruled and testimony admitted. Exception. (Third assignment of error.)

John Z. Spear, a witness on behalf of the defendants, being on the stand, and there being two cigar boxes full of specimens of ore gathered up on the Ashtabula docks, in the month of January, previous to the trial of this case, which cigar boxes were marked Exhibits Nos. 54 and 55, defendants' counsel propounded to the witness the following questions:

Q. I wish you would look at the specimens of ores in the boxes, Exhibits Nos. 54 and 55, and state whether you regard them as first class ores.

Q. Would a cargo of ore like that in Exihbit 54 constitute, in your judgment, a first class ore? Objected to as incompetent and irrelevant. Objections overruled and evidence admitted. Exceptions. (Fourth and fifth assignments of error.)

John W. Chalfant, a witness called by defendants, was asked the following question: Q. State what your opinion is, as a furnace man, as to the necessity, in order to have good results, of uniformity in the character or classification of the ores used in the manufacture of iron? Objected to for same reasons. Evidence admitted. Exception. (Sixth assignment of error.)

The defendants submitted the following points:

1. That it was a term or condition of the contract between the West Republic Mining Co. and Jones & Laughlins, that the ore to be furnished should be in quality up to the sample car previously sent the latter for trial.

Affirmed. (Seventh assignment of error.)

2. That if the jury find from the evidence that the quality of the ore sent from time to time under the contract proved to be inferior to that of the sample car, and that the defendants, from time to time, gave reasonable notice of such defectiveness, then the defendants had a legal right, on January 9th, 1883, to direct all further shipments to be stopped, and to refuse to accept that portion of the ore, 1,706 tons, that then remained undelivered and unaccepted, and the plaintiff cannot recover anything on account of said unaccepted portion.

Affirmed. (Eighth assignment of error.)

3. That if the jury find from the evidence that the quality of the ore actually sent to and received by the defendants

proved to be inferior to that of the sample car, then the defendants have a legal right to set-off or recoup in this action, as against the contract price the difference between the contract price and the market value of said ore at the time when the defendants elected to retain and use the same subjected to their objections to its quality, being March 3d, 1883.

*Answer.* The third point is affirmed except the last clause referring to the time when the market price should be ascertained. That I refer to the jury as a question of fact under the general charge, and this further instruction that if the defendants were delayed in making a final decision until the date named through representations and inducements held out by the plaintiff, then that would be the date for fixing the market price. (Ninth assignment of error.)

4. That if the court decline to charge as requested in the third point, then the court is requested to charge that the jury will inquire, under the evidence, whether the delay in the defendants in finally electing to rescind was in view of the circumstances a reasonable one, and if they find it was reasonable, the defendants are to be charged with the market value of the ore received as of the date of such election and not the date of the receipt of the ore.

*Answer.* This point, as I understand it, refers only to the time for fixing the market price. I answer it thus. If the defendants at the time they received the different shipments intended to keep and use the ore although of inferior quality, and notified the plaintiffs of its inferior quality, they would be liable to pay for it at the market price at the time the ore was received, but if received under protest, and held for the plaintiffs, and the plaintiffs were so notified, and afterwards, when plaintiffs refused to take it back, was used by the defendants, the date of their election to use it would be the date for fixing the market price. (Tenth assignment of error.)

5. That if the jury find from the evidence that the quality of the ore furnished by plaintiffs was inferior to that of the sample car, they shall allow the defendants the difference between the contract price and the market value of the ore furnished, and they can allow interest on the balance due by defendants, *or not*, as they think proper under the circumstances. The question of *interest* is a matter for their discretion.

Affirmed. (Eleventh assignment of error.)

In the general charge, the court instructed the jury, *inter alia*, as follows:

" A part of the contract is that the quality of ore shall be up to the sample car load sent, and these words are an essential part of the contract. They do not constitute a col-

lateral or independent warranty. They are a part of the contract itself. Strictly speaking they are not a warranty at all, but are rather a condition of the contract. They mean substantially this, we will take 5,000 tons of your ore if the quality be up to the sample you sent us. By accepting that proposition the plaintiffs contracted to furnish ore of that quality, and had no right to furnish ore of an inferior quality. If they did furnish ore of an inferior quality, the defendants had two remedies; first, they might refuse to receive it, and, by notifying the plaintiffs to that effect, be relieved from accepting or paying for it; or, second, they might receive it, and by notifying the plaintiffs of its inferior quality, be relieved from paying the contract price, but would be liable to pay its market value. . . . . If the ore delivered in May was not up to the standard, but was only worth six or eight dollars a ton in place of ten dollars, the defendants should be only charged the former price, and so if any of the shipments was not equal to the sample car load and was inferior in value, the defendants should only be required to pay what was its market price. . . . . If you find the ore was not equal in value to the sample ore, then you must pass to the question of its market value, under the instructions I have given you. If the ore was only worth six dollars a ton, you will allow six dollars or any other price of which you are satisfied from the evidence, you will fix that as the price of the ore for which the defendants should be charged." (Twelfth, thirteenth and fourteenth assignments of error.)

"The contract, as I have said, requires the ore to be of the quality of the sample car load sent. It does not require the ore to be equal to the Old Republic ore, or to measure up to a certain chemical analysis. It is to be equal in quality to that in the sample car load sent. If it was equal in quality to that sample, it was a compliance with the contract, although it may not have been equal to Old Republic No. 1. But you are not to disregard the evidence of the analysis, or as to the ore being of the first quality, or in reference to its comparison with the Old Republic ore. You should consider the evidence so far as it throws light upon the quality of the ore in the sample car sent." (Fifteenth assignment of error.)

Verdict for plaintiffs, for $15,534, and judgment thereon, whereupon they took this writ of error, assigning for error the admission of defendants' evidence, and the answers to their points as above, and those parts of the general charge quoted.

*John Dalzell*, for plaintiffs in error.—Assuming that the plaintiffs were bound under the contract to furnish ore equal

to the sample car load, the evidence contained in the first assignment, to wit: that plaintiffs had represented to the witness that the ore was equal to the best Old Republic ore, was certainly inadmissible, because it gave the jury the impression that the plaintiffs' duty was measured by the quality of No. 1 Old Republic ore, instead of by the sample car load. This error ran through the whole trial. The contract was severable, not entire: Morgan *v.* McKee, 27 P. F. S. 228; Lucesco Oil Co. *v.* Brewer, 16 P. F. S. 351. It follows that as to all ore received, taken off the cars and paid for, the dealings between the parties were complete, and no damages or abatement of the sum paid could be allowed the defendants. The court below held the contrary and the jury were allowed by their verdict to give back to the defendants part of the price on ore accepted, used and actually paid for. The words of the contract were: " Quality of ore to be up to the sample car load sent us." These words raised no liability as to the quality of the goods: Coulston *v.* City National Bank, 4 W. N. C. 297. Evidence as to representations is not competent to prove a warranty: Whittaker *v.* Eastwick, 25 P. F. S. 231; Wetherill *v.* Neilson, 8 Harris 448; McFarland *v.* Newman, 9 Watts 55. Warranty cannot be established by parol testimony where the contract is in writing. All the evidence tending to show that there was some kind of an understanding that the ore should be equal to Old Republic was incompetent: Gardiner *v.* Gray, 4 Camp. 143; Powell *v.* Edmunds, 12 East 6. It was therefore error to permit the jury to recoup in favor of the defendants on the May and June shipments. The plaintiffs were entitled to interest and the submission of this question to the jury was error. Interest is the legal and uniform rate of damages allowed in the absence of any express contract, when payment is withheld after it has become the duty of the debtor to discharge the debt and the allowance of it is a matter of legal right: Minard *v.* Beans, 14 P. F. S. 411; Delaware R. R. Co. *v.* Burson, 11 P. F. S. 381; Gray *v.* Van Amringe, 2 W. & S. 128.

*George Shiras, Jr.* (with whom was *John D. McKennan*) for defendants in error.—There was no attempt made to enlarge the obligation of the plaintiff company by holding it to the duty of furnishing ore equal to the Old Republic, but after having proved that the sample car load was fit for fix, reference was made to Old Republic ore to explain what fix was. The court below distinctly charged the jury that the contract did not require the ore to be equal to old Republic, but that a comparison with it might be made. And so the purpose of

the letters of the correspondence and the testimony, was not to alter or enlarge the contract by means of prior negotiations, expressions of opinion or representations, but by them to interpret the agreement and to show that the sale and purchase were made under the plain understanding that the ore was to be used for fix. The plaintiffs were bound by the contract to furnish ore equal to the sample car load. This was made a condition of the contract, and their duty under it is illustrated in Sims *v.* Stribler, 13 W. N. C. 92, and Warren *v.* Phila. Coal Co., 2 Norris 437. The plaintiffs having ignored this essential condition of the contract the defendants declared the same at an end. It is well settled in Pennsylvania that a defendant may recoup damages arising out of the same transaction as that on which suit is brought: Shaw *v.* Badger, 12 S. & R. 275; Hubler *v.* Tamney, 5 Watts 51; Patterson *v.* Hulings, 10 Barr 508; Hunt *v.* Gilmore, 9 P. F. S. 450. The defendants in this case adopted the remedy of recoupment, and a rebate on a quantity of ore which had been received and paid for was allowed. The propriety of this recoupment is based upon the fact that the contract was entire; and that it was entire is shown by the application to its terms, of the rule laid down in Parsons on Contracts, 29–31, and in Lucesco Oil Company *v.* Brewer, 16 P. F. S. 351. The allowance of interest is governed by equitable rules, and depends upon some default or impropriety of the debtor in withholding the sum which he owes after it should have been paid: Buck *v.* Fisher, 4 Wh. 516; Naglee *v.* Ingersoll, 7 Pa. St. 185; Gaskins *v.* Gaskins, 17 S. & R. 390; Uhland *v.* Uhland, Id.. 265; Boyd *v.* Boyd, 1 Watts 365; Hummel *v.* Brown, 12 Harris 310; Weir *v.* Allegheny Co. 95 Pa. St. 413.

Mr. Justice TRUNKEY delivered the opinion of the court, January 5th, 1885.

This action is upon a contract dated February. 16th, 1882, struck by the plaintiffs' acceptance of the following proposition : "We have tried the West Republic ore lately sent us, and find it satisfactory. We will take (5000) five thousand tons of it, at $10 per ton, at Ashtabula. Payments to be made for five hundred tons per month, beginning in May next. And we will advise you from time to time as to which road to send it by. Quality of ore to be up to the sample car load sent us."

For a correct understanding of the contract it is well to note the plaintiffs' letter to the defendants,. dated January 18th, 1882, as follows : "We would like to send you a car or two of our West Republic ore to try for fix. It is equal to

the best Old Republic ore, and although the price is the same, we think you will be better pleased to have two places to buy this grade of ore. Can sell you 3000 tons for 1882 delivery, at $10 cash." Also their letter of February 6th, 1882: "As soon as you have tried the West Republic ore would like to hear from you. Are holding 5 to 6000 tons for you for fix."

These letters are not a part of the contract, but they explain how it came that the sample was sent, for what it was sent, and the price for which the plaintiffs proposed to sell. The sample was sent to be tried for fix, was so tried, and thereupon the contract was made. It would be difficult for a man unlearned in the law to interpret that contract as not obligating the plaintiffs to deliver West Republic ore of as good quality as that which was sent to and tried by the defendants. The quality of the ore cannot be up to the sample unless it be equal to it. Notwithstanding the plain terms of the contract, the plaintiffs contend it is performed by delivering merchantable ore from the West Republic mine, though of inferior quality to the stipulated standard, and unfit for fix.

The rule is almost universal that in a sale of goods by sample the vendor warrants the quality of the bulk to be equal to that of the sample. But in Pennsylvania that rule is eschewed, and a sale by sample becomes a guaranty only that the article to be delivered shall follow its kind, and be simply merchantable.: Boyd v. Wilson, 83 Pa. St. 319. Yet in the opinion in that case it is recognized that something may be said or done by the parties to the contract to make the sample a standard of the quality. And in Warren v. Philadelphia Coal Co., Id. 437, an action by the vendor of coal to recover the price, it was ruled that testimony was admissible that the seller had assured the buyer that a certain cargo of coal was of the same quality as he had been buying, whereupon he agreed to purchase it, and that said cargo was not so good. It was remarked that nothing in the common law rule stands in the way of a contract stipulation as to quality. To constitute a warranty no special form of words is necessary. The word warrant is not so technical that it may not be supplied by others. A contract to deliver goods of a defined quality is as capable of enforcement as any other contract. The foregoing is not militated by Wetherill v. Neilson, 20 Pa. St. 448. There the contract as construed by the court did not include an express undertaking that the goods should be up to or equal to a named standard. It was held to include no more than a representation, and in absence of warranty or fraud the buyer took the risk of the quality. Here a quantity of ore was sent to be tried, and was tried for a specific purpose, was found satisfactory for that purpose, and the plaintiffs

agreed to deliver ore of the same quality. Nothing less fills the measure of the agreement. It is unnecessary to say whether the stipulation is a warranty or condition, it is a term of the contract, and if broken by the plaintiffs they are liable for the breach.

Whether the contract was severable or entire depends on the intention of the parties. If the part to be performed by one party consists of several distinct items, and the price to be paid by the other is apportioned to each item, or is left to be implied by law, generally, the contract is held to be severable. So, where the price to be paid is distinctly apportioned to different parts of what is to be performed, though the latter in its nature is single. But the mere fact that the subject of the contract is sold by weight, and the value is ascertained by the price per pound, will not render the contract severable : 2 Par. Cont. 29–31. Here there were no distinct items in the subject for delivery, the whole was sold for a certain price per ton, and the buyer to pay for a certain number of tons each month. There was no expression as to the number of tons to be delivered per month, or when the delivery should be completed. The first payment was made before any ore was delivered, and though the defendants afterwards withheld payments, they alleged the withholding was because the ore was defective, not that the payments had not become due by reason of non-delivery of ore. Considering the language of the contract in connection with the conceded acts of the parties under it, we think the contract was entire.

The seventh, eighth, twelfth, thirteenth and fourteenth assignments of error are not well taken.

The plaintiffs' representation that their ore was equal to the best Old Republic ore, was not embraced in the contract. It may have induced the defendants to receive and test the car load of ore, but the contract refers solely to the ore so tested as the standard of quality. Therefore the first assignment of error must be sustained. Much of the testimony proposed in the offer set out in that assignment was admissible, but not the plaintiffs' representations respecting the Old Republic ore, nor the quality of that ore, and that the defendants had used it and knew its quality. If the ore delivered was inferior to that required by the contract, the fact cannot be shown by comparing it with ore from some other mine. So much of the charge set out in the fifteenth assignment as directs the jury to consider the evidence with reference to the comparison of the ore delivered under the contract with Old Republic ore, is erroneous. The parties so often referred to the Old Republic ore, in their previous negotiations and subsequent disputes, although it was not made the standard, that greater

care should be taken to avoid submitting a comparison between that and the ore delivered under the agreement.

It is undisputed that the sample was first class ore, and of good quality for fix, and that the best ores for that purpose are low in silica. As respects West Republic ore, it scarcely seems controverted that its value for fix depends on. the fact that it is low in silica and high in iron. The plaintiffs proved by one witness that he had sold a superior ore for fix which contained only fifty-two per centum of metallic iron, but it had other qualities which made it almost impervious to heat; they do not claim to have furnished to the defendants that kind of ore. They claim that the ore delivered and received was equal to the sample, and the defendants claim that it was inferior because not properly selected and culled. The testimony respecting the quality and uniformity of the ore delivered under the contract was conflicting; that adduced by one party tending to show that the sample was clean, lumpy and very uniform, and that the ore subsequently delivered did not compare at all with the sample; and that adduced by the other tending to show the ore was equal to the sample. To determine the pertinency of the evidence alleged to have been improperly admitted, the uncontroverted facts, as well as the controverted, must be considered.

The third assignment is not sustained. The testimony of Otto Wuth, in connection with other evidence, tends to show that the ore delivered under the contract was unfit for fix, ununiform and badly culled; that some of it had a high per centum of iron and was of good quality, but was so mixed with rock and inferior ore that the mass was not first class, and contained so much silica that it was unfit for fix.

The testimony on the part of the defendants shows that before and at the time of loading the ore on the cars, men were employed in culling, and the plaintiffs contend that work was thoroughly done. Within a few weeks before the trial, and more than a year after the last delivery, two boxes were filled from the fall of an unculled pile of the plaintiffs' ore, and in presence of the jury exhibited to an expert, who testified that it was a mixed-up mass, some of it rock, some second class ore, and some good first class ore, and the great trouble was want of uniformity. The fourth and fifth assignments are sustained.

If the jury found that the ore delivered under the contract was unfit for fix because it was not so good and uniform as the sample, still it had some market value for other purposes. If uniformity was essential for best results for other uses, it was competent to show that fact, to be considered in deter

mining the market value of the ore.    There is no error in the matter of the sixth assignment.

It was incompetent to prove the difference in value between the sample and other ore.    The mode of ascertaining the damage was indicated in the affidavit of defence.    Were the cause not to be reversed on other grounds than the matter which is the subject of the second assignment, it would be necessary to inquire whether the answer of the witness was harmless.

On July 31st, 1882, the defendants, having stopped shipments, wrote to the plaintiffs that they would not receive or take off the cars any more ore that was not fully up to the standard.    September 30th they wrote again, saying they would make another trial of the ore, and unless it would be equal in every respect to best No. 1 Republic, they would decline to receive or unload it.    To that the plaintiffs replied that they would give what was contracted for, No. 1 West Republic ore.    From that date, October 3d, there was no complaint on the one side, nor inducements and representations on the other, as to the quality of the ore, until January 9th, 1883, when the defendants stopped shipments, on the ground that in the furnace the ore yielded no more than 60 to 62 per centum of metallic iron.    There is no evidence that any of the ore shipped after the 3d of October was received under protest and held for the plaintiffs ; no protest was made until after it had been taken by the defendants from the cars ; and repeatedly the plaintiffs were urged to speed the shipments. The respective dates for fixing the market price are the dates the defendants received the ore, and the ninth and tenth assignments are sustained.

The defendants admit indebtedness to the plaintiffs. A dispute has arisen respecting the performance of the contract by the plaintiffs, and the amount of the debt, but however determined, the debt arises from contract.    The jury were instructed that in their discretion they could allow or disallow interest on the balance due as they should think proper under the circumstances.    That question was not for the jury.    Interest shall be allowed in all cases of contract where it is the duty of the debtor to pay money without a previous demand by the creditor.    When a definite time is fixed for the payment of money the law imposes the obligation to pay damages by way of interest at the legal rate, for the detention of the money after the breach of the contract for its payment : Foote *v.* Blanchard, 6 Allen 221.    The right to interest upon money owing upon contract depends not on discretion, but upon legal right : Dana *v.* Fiedler, 12 N. Y. 40 ; Adams *v.* Fort Plain Bank, 36 Id. 255.    " It is a legal and uniform rate of dam-

[Bown *v*. Morange to use of Hall.]

ages, in absence of any express contract, when payment is withheld after it has become the duty of the debtor to discharge the debt:" Minard *v*. Beans, 64 Pa. St. 411.   If that was a dictum we think it accords with the policy of this state. Soon after this court decided that no judgment could bear interest from the date of the verdict on which it was entered, unless entered on same date, the legislature enacted that it shall be lawful for a party in whose favor a verdict may be rendered for a sum of money, after judgment thereon, to collect interest from the date of the verdict.   Where land is taken by a corporation in the exercise of eminent domain, interest should be added to the amount of damages from the time the landowner was entitled to compensation : Delaware R'y. Co. *v*. Burson, 61 Pa. St. 369.   Generally, in this country, interest is looked upon as an incident of the money, to be paid with the principal when the latter has been withheld after it became the duty of the debtor to pay it.   The conflict on this subject between the English and American cases need not be noted, nor would it profit to note some exceptional cases in this country.   In this state it seems to have been long understood that where it is the duty of the debtor to pay the sum he owes, and the creditor demands a greater sum, the debtor can only relieve himself from liability by tendering payment of the debt.   A bona fide dispute as to the amount of indebtedness is no bar to the accruing of interest.   If a tender of payment falls short of the sum found to be due at the time of the tender, interest runs on the whole.   The defendants' fifth point should have been refused.

Judgment reversed and venire facias de novo awarded.