**Shared Communications Services of 1800 and 1880 JFK. Boulevard Inc. v. Bell Atlantic Properties Inc. et al.**

324

*Donald N. David, admitted pro hac vice,* for plaintiff.
*Wilbur L. Kipnes* and *Nicole Reimann,* for defendants.

HERRON, *J.,* March 1, 1996—

## PART I: INTRODUCTION

### *The Parties*

The contract defendants, Bell Atlantic Properties and Metropolitan Life Insurance Company, are owners in

two commercial office building real estate joint ventures located in Center City Philadelphia at 1800 and 1880 JFK Boulevard, the "buildings." Plaintiff Shared Communications Services and the contract defendants are parties to a written agreement, the "SCS agreement," under which SCS provides shared office-related services to commercial lease tenants.

Contract defendant BAP is a subsidiary of tort defendant Bell Atlantic Corporation and an affiliate of tort defendant Bell Atlantic-Pennsylvania.

## *The Action and Verdict*

Following a five-week trial, the jury in this case returned verdicts against the moving defendants on plaintiff SCS's contract, intentional tort and punitive damages claims. In addition, a verdict was entered in favor of the 1800 joint venture and against plaintiff SCS on the former's counterclaim for rents due.[1]

In its complaint, plaintiff claimed damages for breach of contract, conspiracy to commit tortious interference with contractual and business relations, tortious interference with contractual and business relations, common law antitrust and anti-competitive behavior and commercial disparagement.

Following the conclusion of plaintiff's case-in-chief, defendants moved the court to enter compulsory nonsuit on nearly all counts. Following argument on those motions, the court dismissed plaintiff's antitrust and anti-competitive claims and the claim of commercial dis-

---

1. Discussion of the post-verdict request to mold the verdict on this counterclaim appears at part III of this opinion. Discussion of contract defendant BAP's challenge to that portion of the verdict relating to plaintiff's specific contract claim for equipment rental charges appears at part IV.

paragement. The court denied the other motions for compulsory nonsuit. (See February 22, 1995, N.T. 232-35.)[2]

At the conclusion of the trial, the jury found in plaintiff's behalf on the contract claim, finding that the contract defendants breached sections 1.01, 1.03, 2.01(b), 2.03, 5.03, 5.04 and 5.05 of the SCS agreement. The jury also found that tort defendants BAC and Bell of PA conspired to interfere with plaintiff's existing and prospective contractual relations and that tort defendant Bell of PA interfered with plaintiff's existing and prospective contractual relations. A verdict finding was made as well that the conduct of the tort defendants was outrageous, warranting awards of punitive damages.

On the breach of the SCS agreement claim, the jury awarded plaintiff $2,978,000. On the civil conspiracy claim, the jury awarded plaintiff $83,571 in compensatory damages and $2,500,000 in punitive damages. On the tortious interference claim, the jury awarded plaintiff $250,000 in compensatory damages and $250,000 in punitive damages.

PART II: CHALLENGE TO THE VERDICTS RELATING TO PLAINTIFF'S CLAIMS BASED ON THE SCS AGREEMENT AND FOR CIVIL CONSPIRACY, TORTIOUS INTERFERENCE AND OUTRAGEOUS CONDUCT

*Factual Background*

As noted above, contract defendants BAP and Met-Life are owners in two Center City commercial office

---

2. On February 24, 1995, the parties agreed to the entry of a nonsuit on plaintiff's claims against additional tort defendant Eastern Telelogic Corporation.

building real estate joint ventures located at 1800 and 1880 JFK Boulevard. Contract defendant BAP purchased its ownership interests in the 1800 and 1880 JFK buildings from Evans-Pitcairn Corporation, "Pitcairn Properties," in September 1986. Contract defendant MetLife, however, was an original partner in the ventures with Pitcairn Properties.

Prior to BAP's purchase of an ownership interest, the 1800 and 1880 JFK properties were under written agreement, the "Sharetech agreement," with Sharetech, a service provider of shared office-related tenant services and plaintiff SCS's predecessor in interest.

"Shared tenant services," "sts," are office support services provided by an independent contractor and to which commercial building tenants may subscribe to defray their own costs. "Sts" can include basic telephone service, telephone answering and telephone message center service, word processing, data processing, telex, teleconferencing, copier services, temporary personnel services, tenant-specific security services, and the like.[3]

The original owners of the 1800 and 1880 JFK buildings were not themselves involved, directly or indirectly, in the provision of telecommunication services of the type included in the "sts" product definition set forth under the Sharetech agreement. Tort defendant Bell of PA, however, was and is.

Evans-Pitcairn Management Corporation managed the 1800 and 1880 JFK properties as "manager" under the Sharetech agreement and, later, after BAP purchased the Pitcairn ownership interest, Evans-Pitcairn employees worked on an independent contractor basis under

---

3. Both the Sharetech and the SCS agreements provide identical "sts" definition sections listing the shared tenant services contemplated under the agreements.

BAP's managerial aegis. In or about January 1990, BAP hired Evans-Pitcairn employees to manage the buildings, ending all Evans-Pitcairn corporate involvement in the properties.

In late 1985, early 1986, it came to plaintiff SCS's attention that Sharetech was selling its entire portfolio of approximately 48 projects, including its interest in the Sharetech agreement. SCS successfully bid on 12 of the projects. Sharetech and SCS entered into an asset purchase agreement with respect to four of these projects, pursuant to which, inter alia, SCS agreed to purchase Sharetech's equipment in 1800 and 1880 JFK, acquire the rights and benefits of Sharetech's investment (including all hardware installed), and assume Sharetech's obligations under its then-existing contracts with tenants and the owners of these two buildings. A precondition to closing the sale was the 1800 and 1880 JFK buildings owners' acceptance of SCS.

On March 7, 1986, Paula Brown, president of plaintiff SCS, and Ivan Wolff of Rothchild Ventures (SCS's venture capitalist) met with Mr. Tony Lordi of Pitcairn Properties to discuss SCS becoming the successor "sts" provider. Plaintiff presented evidence that the original intent of SCS and the joint venture owners was to assign the Sharetech agreement essentially "as is." For example, plaintiff presented trial testimony which showed that the Sharetech agreement was intended to extend the provision of "sts" into other buildings owned and/or managed by the original owners and the "manager" (a signing party to the agreement) of 1800 and 1880 JFK, as well as to other buildings owned by their corporate affiliates. (This extension of services was referred to at trial as the "other buildings" services.) Indeed, Mr. Lordi of Pitcairn Properties testified that, because enthusiasm for the concept of "sts" was so strong, he

attempted during his negotiations of the Sharetech agreement, albeit unsuccessfully, to obtain Sharetech's promise that it would *only* service Pitcairn-related properties.

Plaintiff presented evidence that it too was requested to provide "sts" in other projects within the MetLife and Pitcairn portfolios. For example, at Lordi's request, SCS provided both Pitcairn and MetLife with financial detail and a business plan showing SCS's intent and ability to generate capital sufficient to finance multiple projects, including the extension of "sts" into the "other buildings." Plaintiff's evidence was consistent with Mr. Lordi's acknowledgment that the joint venture owners had sought exclusivity from Sharetech and with his express view that "sts" was an important building amenity.

In or about April 1986, SCS was advised that contract defendant BAP had contracted to purchase the 1800 and 1880 JFK ownership interests of Pitcairn Properties. While representatives of Pitcairn continued to represent the joint venture interests in negotiations with SCS concerning the assignment of the Sharetech agreement, BAP also took an active role in those negotiations. Plaintiff presented evidence to demonstrate that in most all respects other than the matter of a BAP-negotiated change affecting the concession fee arrangement set forth at article 7 of the Sharetech agreement, the final SCS agreement, executed on September 9, 1986, reflects the carrying over of whole portions of the written provisions from the Sharetech agreement (including reference to the Ten and Eleven Penn Center buildings[4]),

_____

4. Historically, at the same time that Sharetech approached Pitcairn Properties in order to access an "sts" market in the latter's commercial real estate holdings, Sharetech sought to offer "sts" in Ten and Eleven Penn Center. Those two office buildings are adjacent to 1800 and

with the rights enjoyed and obligations owed by SCS essentially the same as those enjoyed and owed by Sharetech.

As to the BAP negotiated change affecting article 7 of the Sharetech agreement, it was not disputed that the Sharetech agreement contained a compensation scheme whereby the joint venture owners of the 1800 and 1880 JFK properties were to profit from Sharetech's servicing of tenants in the "other buildings." Calculation of the monies to be paid by Sharetech to the joint venture owners as a result of this "other buildings" services was based on a net rentable square footage occupied by "sts"—user tenants in the "other buildings." [5]

In connection with the negotiations for the assignment of the Sharetech agreement to SCS, however, BAP identified this compensation clause as a potential internal conflict of interest for BAP and tort defendants BAC

---

1880 JFK and not separated by public right of way. When Mr. Lordi was unable to obtain an exclusive contract with Sharetech, he required at the least that Sharetech not service any non-Pitcairn property from the "sts" Resource Center facility to be located in 1880 JFK. However, Sharetech bargained for the right to service the Penn Center properties from that facility and, hence, they are referenced in the agreements.

5. Article 7 of the Sharetech agreement contained a schedule of compensation contemplating Sharetech servicing "other buildings" for which the original owners (MetLife and Pitcairn Properties) were entitled to an amount which could conceivably total a net rentable square footage exceeding 5,000,000 square feet. To achieve such a total, it would have been necessary to include buildings other than 1800 and 1880 JFK and Ten and Eleven Penn Center buildings, the four of which are all specifically mentioned in both the Sharetech and the SCS agreements. Combined, however, these four buildings consist only of an aggregate 1,700,000 net rentable square feet. Plaintiff SCS argued that the above square footage comparison is additional evidence of the intent of the parties to extend provision of "sts" services to the "other buildings."

and Bell of PA. Specifically, BAP stated that the "other buildings" concession fee clause in the Sharetech agreement appeared to be contrary to the corporate obligations of BAC and its affiliates under a federal court order,[6] commonly referred to as the "modified final judgment," and which otherwise prohibited BAC, directly or through any of its affiliates, from receiving monies as a result of long-distance telephone operations. (Tort defendant Bell of PA is one of the operating entities directly subject to the "modified final judgment".)

Directly as a result of that concern, the concession fee clause at article 7 of the Sharetech agreement was deleted altogether from the SCS agreement and, in its stead, a flat $1.25 per square foot added to the annual rental previously negotiated under the Sharetech agreement for the 1800 JFK Resource Center facility space leased by the "sts" provider.

This undisputed evidence was emphasized by plaintiff to demonstrate, inter alia, a critical connection between defendants BAP, BAC and Bell of PA vis-a-vis the acquisition and operations of the 1800 and 1880 JFK buildings; the intent of the contracting parties to extend the SCS agreement to the "other buildings" in quid pro quo, originally for a share in the concession, and ultimately for the increased rental rate chargeable to plaintiff on the Resource Center leased space; and, further, as part of plaintiff's circumstantial evidence that tort defendants BAC and Bell of PA had knowledge as early as September 1986 of the terms and conditions of the SCS agreement.

It should be noted as well that at the time of the negotiations between SCS and the original owners (Met-

---

6. *United States of America v. American Telephone and Telegraph Company,* 552 F. Supp. 131 (D.C. 1982).

Life and Pitcairn Properties), and the surfacing of BAP as a successor to Pitcairn Properties, Mr. William Martin was in-house counsel at BAC. In that capacity, Mr. Martin represented BAP's interests in discussions with counsel for SCS, Mr. Robert Friedman. Mr. Martin continued to have assigned responsibility for BAP while employed directly by BAC until March of 1987, when he was appointed vice-president and general counsel of BAP and ultimately, chief administrative officer and general counsel of BAP. For much of the time relevant to SCS's claims in this suit, Mr. Martin took responsibility for BAP's decision-making. This included his admission at trial that during the period from October 1990 to mid-1992, after consultation with other in-house counsel at Bell of PA and BAC, he issued instructions to the BAP managerial staff specifically requiring that they no longer "recommend" or "advise" in accordance with sections 5.03 and 5.04 of the agreement.[7]

Plaintiff also presented evidence that, in addition to Mr. Martin, BAC's chief counsel, Mr. Allen Bulliner, acted on behalf of the common interests of BAC, Bell of PA and BAP and that he familiarized himself with the operations of the buildings and the "sts" tenant-provider sufficiently to execute an opinion letter on September 9, 1986, (plaintiff's exhibit no. 68) addressed to BAC's proposed joint venture partner, MetLife.

Of further significance to this case is the fact that, despite little change in the written language between the Sharetech and SCS agreements and despite substantial continuity in the personnel responsible for carrying out the functions of "manager" under these agreements, what did change dramatically following BAP's

---

7. Martin advised representatives of MetLife of this action and they agreed to it.

purchase of the Pitcairn ownership interests was the spirit of cooperation previously enjoyed between the 1800 and 1880 JFK building owners and its "sts" provider.

In this regard, trial evidence showed that, pursuant to the Sharetech agreement and for a period of time under the subsequent SCS agreement, the 1800 and 1880 JFK buildings' managerial staff actively promoted the "sts" concept[8] and shared information with the "sts" provider regarding the identities of prospective and new tenants. Once BAP was up and running as an interested party, however, performance under the SCS agreement by the contract defendants eventually plummeted. The most recent rental agent for the 1800 and 1880 buildings, Jackson-Cross leasing agent David Jarjisian, testified at trial that prospective tenants were, at best, told of "sts" and SCS in the same breath as the agent's passing references to the lobby coffee shop or bank branch made during the initial tenant walk-throughs. Moreover, no sharing of prospective tenant information occurred.

Plaintiff presented evidence which showed that the contract defendants refused SCS's requests that it be permitted the opportunity to offer its services in "other

---

8. "THE WITNESS (Widerman): Generally I would tell the [prospective] tenants that there was a tenant in the building who provided telecommunications services to tenants in the building, that they had an AT&T System 85 telephone switch in the building and that that switch was capable of providing what I called a lot of bells and whistles that are available in the telecommunications industry for tenants of all sizes. That [sic] [concluded], I would generally go on to say that included automatic lease cost routing, that they also had reserved telephone numbers so if a tenant was looking for quick occupancy, they could get their telephone number today and get their letterhead printed, generally things along those lines." (February 22, 1995; Widerman; N.T. 99-100.)

buildings"; failed in their responsibility to recommend "sts" to prospective tenants despite SCS's requests that they do so; failed to advise SCS of new and prospective tenants, failed to advise prospective tenants of SCS's services, and failed to advise the 1800 and 1880 JFK rental agents of these same contractual obligations to SCS; failed to advise the 1800 and 1880 JFK rental agents of a prohibition against sharing the names of prospective tenants with any "sts" provider other than SCS; and failed to inform SCS that BAP affiliates were moving into the 1800 and 1880 JFK buildings. The applicable contractual provisions under the SCS agreement are as follows:

"Section 1.01. SCS shall offer and provide STS to tenants of the buildings [*i.e.*, 1800 and 1880 JFK]. Manager may give SCS the opportunity to provide STS in other existing buildings [*i.e.*, 'other buildings'] which are owned or managed by manager . . . ,[9]

"Section 1.03. The owners agree that SCS may offer the delivery of integrated office services into . . . any other building or buildings which are owned by manager, Metropolitan Life Insurance Company or any affiliate (as hereinafter defined in section 13.02[10]) of either of

---

9. Section 1.01 contains a proviso at this juncture of the agreement which conditions SCS's right to the "opportunity to provide STS in other existing buildings which are owned or managed by manager" on manager's "reasonable judgment" that SCS was performing satisfactorily in the 1800 and 1880 JFK buildings. At no time, however, did the manager (first, Evans-Pitcairn Management Corporation and later, BAP) ever assert that SCS's performance at the 1800 and 1880 JFK buildings was not satisfactory. Instead, BAP consistently took the position that section 1.01, by use of the word "may," conferred absolute discretion in BAP to refuse SCS's requests for access.

10. Section 13.02 provides: "As used in this agreement, affiliate of a party shall mean any person, corporation or other business entity which shall directly or indirectly control, be controlled by or be under common control with such party."

them or any partnership in which any of them is a general partner and which can be serviced by or from the Resource Center to be located in 1800 John F. Kennedy Boulevard. [. . .];

"Section 5.03. Owner and manager agree to cooperate with SCS in sharing names of prospective and actual tenants in the buildings and not to provide such information relating to actual or prospective tenants to others providing services within the definition of STS. [. . .];

"Section 5.04. Owners, manager or their agents shall provide to prospective tenants information about the services available from SCS and shall recommend STS to tenants and prospective tenants. Neither owners nor manager shall recommend to tenants other entities which offer services within the definition of STS and owners and manager shall instruct their agents not to recommend to tenants other entities which offer services within the definition of STS."

In addition, plaintiff presented credible evidence demonstrating that access was permitted to the telephone closets and/or distribution frames to outside telecommunications providers[11] without contractually required advance notice to SCS. In 1990, Bell of PA installed riser cable through 1800 JFK and serviced BAP and BAP affiliates who occupied space as tenants in the 1800 and 1880 JFK buildings (such as Bell Atlantic Enterprises, BAP itself, BAC, and Bell Atlantic Tricon), without SCS being informed. As to these same BAP affiliates, all failed to subscribe to SCS's telecommunications services while tenanted in the JFK buildings

11. In addition to Bell of PA, the evidence was clear that at least one other outside telecommunications provider, ETC, was permitted access without the prior knowledge of plaintiff SCS.

despite SCS's request that they do so. The applicable contractual provisions under the SCS agreement, in addition to those previously set forth above, are as follows:

"Section 2.01(b). SCS will lease from 1880 JFK joint venture the [telecommunications] wiring to be used by SCS's customers. Commencing the first month that SCS services its first telecommunications customer in 1880 [JFK], SCS shall pay monthly rent of . . . $366 during the initial term of this agreement and the first renewal term, if any. Thereafter, SCS shall have the right to use the wiring without charge. [. . .] SCS will maintain the wire it leases from 1880 JFK joint venture. *SCS will manage the wiring system for owner and owner shall pay SCS its then current time and material/field engineering rate for every cross-connect SCS makes for a tenant which is not a telecommunications customer of SCS.*[12] *Owner shall insure that only owner and SCS have access to all intermediate distribution frames and the main distribution frame so long as SCS is managing owner's wiring system;* (emphasis added)

"Section 2.03. [. . .] SCS will have the exclusive right to use conduits, telephone punch-down plywood panels and electrical outlets within the telephone closet which are identified by owners and SCS as being required for the delivery of STS. SCS may secure the space in a telephone closet which is allotted to it by means of a locked metal or wire mesh enclosure. [. . .]

"Section 5.05. If owner or manager o[r] an affiliate of owner or manager has an office in 1800 or 18[8]0 John F. Kennedy Boulevard and, so long as it or an

---

12. Trial evidence proved that as of July 1990, there were 582 wire pairs cross-connected to the fourth through seventh floors of 1880 JFK that were not made by SCS despite this clear contractual requirement that SCS perform all such telephone wire cross-connects.

affiliate owns either building, it will support SCS by subscribing to STS, at a minimum telecommunications services."

As noted earlier, BAP succeeded Evans-Pitcairn Management Corporation as "manager" of the 1800 and 1880 JFK buildings in January 1990. Before that date, the joint venture owners issued a marketing brochure describing the buildings' amenities which included a reference to the available "sts" services. After January 1, 1990, however, the owners issued a marketing brochure describing the buildings' amenities which excluded any reference to the "sts" services. The applicable contractual provisions under the SCS agreement are as follows:

"Section 10.01. SCS will support the marketing, promotion and public relations efforts of owners and manager with respect to developing joint programs for promoting the features of SCS's STS as an incentive for initial tenant sign-up for space. Each party shall bear the cost of its own advertising and promotion unless otherwise agreed upon;

"Section 10.02. Owners, manager and SCS will coordinate all publicity related to SCS's STS business for technical accuracy and proper attribution."[13]

During a trial that lasted five weeks, much evidence, including circumstantial evidence, was developed for the jury's consideration in support of plaintiff's various claims against the contract and the tort defendants. The court is not here attempting to recount all that exists to support the jury's verdicts. In an effort to frame

---

13. The jury found no breach of these marketing provisions by the contract defendants. Their relevance at this juncture is to draw the parameters of the contractually intended relationship between the parties.

the issues at this time, however, the court points out the following additional factual evidence which the parties developed at trial:

—SCS negotiated with BAP, as representative for the joint venture owners, in an attempt to work out the disputes with the contract defendants on a business basis before resorting to legal action;

—Bell of PA is (i) a regulated local exchange monopolist that enjoys market domination in Pennsylvania over local exchange service and access to the local exchange network; (ii) a subsidiary of BAC; (iii) an affiliate of BAP; and (iv) the "telephone company" in Pennsylvania which controls the local network;

—SCS, as a reseller (and aggregator) of local exchange service, and in order to take advantage of economies of scale, purchased blocks of telephone numbers (for ultimate assignment to its customers and ordered its trunk lines directly from Bell of PA;

—SCS is billed directly by Bell of PA and Bell of PA telephone bills are part of SCS's costs and business records;

—As the exclusive provider of non-cellular local exchange telephone service in Pennsylvania, Bell of PA obtains information about its customers and their needs, thereby obtaining a marketing advantage over other telecommunications providers;

—There are two tiers of marketing for an "sts" provider; the first tier (which is the key to the "sts" provider's economic success) being the development of a contractual relationship with a building owner permitting the "sts" provider to operate in the building;

—Bell of PA's product CENTREX is in competition with, inter alia, the PBX-based shared tenant services offered by plaintiff SCS;

—In late 1987 and/or early 1988, SCS's Paula Brown twice complained to Rick Widerman (the employee and/or agent charged by the contract defendants with the responsibility for enforcing the SCS agreement) that owners, manager and their agents were not complying with the "advise" and "recommend" provisions of the agreement (*e.g.*, sections 5.03 and 5.04). Widerman, as a representative of the contract defendants, acknowledged that there was an obligation to supply SCS with the names of prospective and existing tenants and to tell such prospective tenants about SCS. Widerman also told Ms. Brown, however, that Bell of PA's CENTREX component pressured Widerman not to honor those contract provisions;

—In June 1990, SCS employee Walter Bentsen discovered 500 inservice pairs of riser wire leading to the fourth through sixth floors in 1880 JFK that had been appropriated for use by someone else. At a time subsequent to the commencement of this lawsuit and in order to find out to whom some of those wires ran, Bentsen lifted some of the pairs, placed Plexiglas covers over the blocks and posted his name and telephone number on the covers. He also ran an alarm lead. Despite these protective barriers, Bentsen testified, someone removed the Plexiglas covers several times and disabled the alarm;

—The wire pairs located in 1880 JFK that Bentsen discovered, inter alia, ran to BAP affiliates who, concededly, received their telecommunications services from Bell of PA. Bell of PA assigned technicians to 1800 and 1880 for the purpose of servicing the affiliates in those buildings through the provision of CENTREX services and, indeed, it was those technicians who disconnected service at 1880 JFK when the affiliates subsequently moved from the building to another BAP-owned office building;

340

—Bell of PA appropriated the riser wire under SCS's management [SCS agreement at section 2.01(b)] and made cross-connects to service, inter alia, other Bell affiliates having offices in 1880 JFK and, in so doing, required BAP (which controlled access to the telephone closets) to permit it access;

—Service of process in the instant lawsuit occurred in September of 1990. SCS filed its complaint, together with a copy of the actual SCS agreement, in January 1991. Plaintiff argued at trial that, at the latest, Bell of PA and BAC were on inquiry notice of the terms of the contract between SCS and the contract defendants after service of the summons in this action. Of course, as set forth above, plaintiff's evidence suggested that certainly BAC, through its in-house counsel Martin and Bulliner, had knowledge of the SCS agreement terms as early as September of 1986. No witness on behalf of Bell of PA testified at trial to deny plaintiff's proofs relating to whether or when this tort defendant acquired knowledge of the terms and conditions of the SCS agreement;

—BAP filed for a temporary restraining order, seeking to bar SCS from removing Bell of PA-made cross-connects in 1880 JFK. The parties ultimately entered into a stipulation and order dated March 7, 1991 in order to resolve this facet of their dispute during the pendency of the litigation. The stipulation and order barred Bell of PA access to the telephone closets in 1880 JFK without the express permission of SCS. In turn, the stipulation and order barred SCS from interrupting any ongoing telephone service in that building. Nevertheless, in violation of that stipulation and order, Bell of PA disconnected its affiliates' telephone services in 1880 JFK and gained access to the telephone closets, distribution frames, inside wiring and cross-connects, without notice to SCS;

——In August 1992, BAC directed BAP to allow Bell of PA into the fifth floor telephone closet in 1800 JFK over a weekend despite the fact that, as a result of a complaint from plaintiff SCS, BAP employee Mary Quain had left instructions prior to her departure for the weekend that the work should wait until she could gain authority on the following Monday. BAC concedely acted at the request of Bell of PA when the former interceded on the latter's behalf;[14]

——A temporary restraining order was issued on November 22, 1993, which precluded BAP from granting anyone access to the telephone closets in 1800 and 1880 JFK without plaintiff's consent. All defendants in the instant lawsuit had knowledge of that TRO. Nevertheless, in the summer of 1994, a Bell of PA technician was observed in the telephone closet when a telecommunications system was installed in 1880 JFK for one of the building's new tenants, Robert Plan.[15] This occurred without any advance notice to SCS, let alone

---

14. This incident, more fully described in connection with the court's consideration of defendants' challenge to the admissibility of deposition testimony by William O. Albertini, was referred to at trial as the "RBI incident." See part II, section B(3), *infra.*

15. The SCS agreement included a provision whereby a building tenant could contract with a telecommunications server other than SCS: "Notwithstanding anything in this agreement to the contrary, owners may advise tenants that they are free to use any provider of any of the services offered by SCS hereunder and, upon a decision of a tenant to use another service provider, owners may cooperate with and assist such other service provider in connection with its installation of service to such tenant." [Section 5.04 of the SCS agreement.] Cross-connects still were to be performed by SCS:

"Article II

*"Installation*

"2.01(b) . . . Owner shall insure that only owner and SCS have access to all intermediate distribution frames and the main distribution

the latter's consent, in clear violation of the November 1993 TRO;

—Bell affiliates which became tenants in 1800 and 1880 JFK did not negotiate their leases with the leasing agent for the buildings;

—BAP also allowed Eastern Telelogic Corporation (a non-Bell telecommunications company)[16] to install extensive cable in 1800 JFK without plaintiff SCS's permission. ETC was forced by BAP to remove its cable once discovered by SCS, whereas Bell of PA was not forced to remove its cable under similar circumstances;

—A BAC employee "ghost wrote" letters for BAP employee Mary Quain when she dealt with various situations in which SCS insisted upon compliance with various provisions of the SCS agreement;

—BAC vice-president and chief financial officer William Albertini opined that "sound business judgment

---

frame as long as SCS is managing owner's wiring system.

"2.03 Owners shall provide at no charge to SCS adequate telephone closets and risers for installation of a TECHLOOP data highway within the buildings. SCS will have the exclusive right to use conduits, telephone punch-down plywood panels and electrical outlets within the telephone closet which are identified by owners and SCS as being required for the delivery of STS. SCS may secure the space in a telephone closet which is allotted to it by means of a locked metal or wire mesh enclosure. SCS has inspected the telephone closets in 1800 John F. Kennedy Boulevard and approved the same as meeting its requirements.

"Article XII

*"Installation improvement*

"12.01 SCS shall have the right, at its sole discretion, to modify or replace any or all elements of its equipment or systems from time to time upon compliance with article II of this agreement. SCS shall bear the cost of such modification or replacement."

16. See footnote 2, *supra.*

or legal reasons" could support a decision to dishonor a Bell contract.

## Judicial Standard for Post-Trial Relief

Defendants raise issues in challenge of the verdicts based on the quality and quantity of the evidence and on certain asserted grounds of trial error. The legal standard this court must follow in deciding the motion for judgment non obstante veredicto or for a new trial is well settled.

Putting aside consideration of any trial errors, in deciding the sufficiency of the evidence claims the court's role is not to second guess the jury or decide which inferences it would have drawn had it been the fact-finder. Rather, the evidence must be considered in the light most favorable to the verdict winner, plaintiff SCS, and any conflict in evidence must be resolved in SCS's favor. Plaintiff is entitled to the benefit of every reasonable inference of fact arising from the evidence and the court must ask whether, even granting all such benefit in favor of plaintiff, does the law require a verdict in favor of the movants or the granting of a new trial? If it is not clear or if no two reasonable minds could differ that the outcome should have been rendered in favor of the movants, then the court must deny the request for judgment n.o.v. or a new trial. Indeed, it is the court's duty to uphold a jury verdict unless it is unsupported by any credible evidence or otherwise shocks this court's conscience as an unwarranted and, hence, unjust result.[17]

As for defendants' claims based on trial error in either the improper admission of evidence and/or in the court's

---

17. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992); *Burrell v. Philadelphia Electric Company,* 438 Pa. 286, 289, 265 A.2d 516, 518 (1970); *Butler v. Flo-Ron Vending Co.,* 383 Pa. Super. 633, 557 A.2d 730 (1989).

failure to give proper instruction to the jury, the court must determine whether or not the claim is well-founded and not waived and, if so, whether the error affected the verdict. Even with regard to errors of constitutional dimension, such errors will be deemed harmless where they effect no real impact on the ultimate disposition of a particular case. The court must look to the entire record of the trial at which the error is alleged to have occurred to determine if it is harmless error. An erroneous jury instruction will provide the basis for a new trial if the instruction is fundamentally in error and it may have been responsible for the verdict.[18]

## Discussion

The contract defendants sought at trial to cast plaintiff's disappointing results in the 1800 and 1880 JFK buildings as the mere product of SCS's failure to perform at the level of Sharetech's personnel in obtaining tenant clients. They also defended based on conflicting interpretations of key contract provisions relating to the obligations of the buildings' owners and manager towards plaintiff. As for plaintiff's claim of entitlement to offer its services in the "other buildings," defendants flatly denied plaintiff's interpretation of the agreement and also sought to persuade the jury that

---

18. *Mt. Lebanon School District v. W.R. Grace and Co.,* 414 Pa. Super. 455, 468, 607 A.2d 756, 762 (1992), *appeal dismissed,* 534 Pa. 265, 631 A.2d 596 (1993); *Lobalzo v. Varoli,* 409 Pa. 15, 19, 185 A.2d 557, 561 (1962); *Krysmalski v. Tarasovich,* 424 Pa. Super. 121, 127, 622 A.2d 298, 301 (1993); *Commonwealth v Rasheed,* 392 Pa. Super. 280, 288, 572 A.2d 1232, 1235 (1990); *Graham v. Sky Haven Coal Inc.,* 386 Pa. Super. 598, 604, 563 A.2d 891, 894 (1989).

plaintiff had failed to request the right to go into the "other buildings."[19]

The tort defendants sought to persuade the jury[20] that BAP functioned entirely on an independent corporate basis and never to the benefit of BAC or Bell of PA. They also argued that there was insufficient evidence to demonstrate knowledge on their part of the terms and conditions of the SCS agreement or that their actions amounted to anything more than trying to meet the needs of Bell of PA customers.

On post-trial motion, the contract defendants argue that judgment n.o.v. or the grant of a new trial is required because certain of the contested contract provisions permit either but one pro-defense interpretation, or, a finding that no contract existed on account of a failure of a "meeting of the minds." Defendants also contend that the matters of the "other buildings" and "exclusive access" should not have been submitted to the jury for these reasons, or, alternatively, that there was insufficient evidence to support the jury's ultimate findings. Additionally, the contract defendants argue that any damages attributable to a breach of sections 1.01 and/or 1.03 constitute consequential damages and therefore are not recoverable under the terms of the SCS agreement; the court's failure to instruct the jury on waiver constitutes reversible error; and, finally, that cer-

---

19 The contract defendants sought as well to introduce evidence that SCS's performance vis-a-vis tenants was substandard, thereby negating any obligation on their part to permit access to the "other buildings." Because the defendants could point to no evidence that they had ever asserted "unsatisfactory performance" prior to trial as a basis under section 1.01 of the agreement for denying SCS the opportunity to offer its services in the "other buildings," the court disallowed this defense. (February 24, 1995; N.T. 72-73.)

20. The tort defendants successfully convinced this court of the legal insufficiency of plaintiff's antitrust claims.

tain evidentiary rulings by the court impermissibly prejudiced all of the defendants.

The tort defendants add in post-trial objection to the jury's findings of civil conspiracy and intentional interference of an outrageous nature: insufficiency of the evidence; judicial error in finding the legal sufficiency of a civil conspiracy to tortiously interfere existent between two corporate entities who also bear a corporate affiliation with one of the parties to the underlying contract; and, impermissible duplication of damages awarded on the tort and contract claims.

### (A) Insufficiency of the Evidence

As for defendants' challenges based on insufficiency of the evidence, whether in regard to the jury's verdicts or to the court's decision to submit various issues to the jury in the first instance, the court cannot say, having reviewed the contract and heard the evidence (and having observed the parties' full presentations at trial), that no reasonable minds could differ that, as a matter of law, the plaintiff has failed to make out its case. *Scott v. Southwestern Mutual Fire Association,* 436 Pa. Super. 242, 247, 647 A.2d 587, 590 (1994), *appeal denied,* 539 Pa. 694, 653 A.2d 1232 (1994); *Kuhler v. Harrison Construction Co.,* 361 Pa. 100, 103, 62 A.2d 853, 855 (1949).

Initially, the contract defendants complain that sections 1.03 and 2.03 of the SCS agreement are not ambiguous and should not have been submitted to the jury for interpretation.

Plaintiff pressed as the interpretation of section 1.03 the intention that, with respect to "other buildings" owned by the joint ventures, BAP or MetLife, and which could be serviced by SCS from the Resource Center located in 1800 JFK, plaintiff be permitted access to those buildings on the same terms as set forth under the SCS agreement (*e.g.,* "sts" recommended, SCS ad-

vised, etc. . . .). The absence of express language requiring an additional, subsequent written agreement of incorporation, as is found in section 1.01, was noted by plaintiff to bolster this interpretation of section 1.03. Of significance were two further distinctions between sections 1.01 and 1.03: the former being clearly applicable to buildings owned by non-signatories to the SCS agreement, thus reasonably necessitating a subsequent expression of incorporation; and, section 1.01 allows the manager to trigger SCS's access as compared to section 1.03, which places the election to market the "sts" services squarely with SCS.

Plaintiff pressed as the interpretation of section 2.03 the intention that it be provided exclusive access to the telephone closets for the provision of all services which fall into the category of "sts." In addition to the express language of section 2.03 (". . . required for the delivery of STS . . ."), plaintiff noted for the court other provisions of the SCS agreement which lent credence to this broad interpretation, such as the express language of sections 1.02 (the "sts" definition), section 5.02(c) (giving SCS, in effect, the right of first refusal to provide *any* service within the definition of "sts" prior to permitting a third party to provide that service), and section 5.02(d) (referring to the possibility of exclusive access being challenged by excluded "sts" vendors).

The court determined that the interpretations posited by plaintiff were not unreasonable per se and that, indeed, sections 1.03 and 2.03 of the agreement were susceptible of different reasonable constructions.[21] It was incumbent upon the court, therefore, to submit

_____

21. On post-trial motion, the contract defendants insist that the reference to Ten and Eleven Penn Center appearing in section 1.03 requires a finding that plaintiff's interpretation of that provision is per se unreasonable. See however, footnote 4, *supra.* The evidence

the resolution of the conflicting parol evidence relevant to what the parties intended by these ambiguous provisions to the jury for determination. *Hutchison v. Sunbeam Coal Corporation,* 513 Pa. 192, 201, 519 A.2d 385, 390 (1986).

The next question raised by the contract defendants is whether, in regard to those two sections as well as section 1.01, sufficient evidence exists to support the jury's findings that the contract defendants breached these three provisions.

Aside from the factual account previously set forth in this opinion, the record is replete with other additional evidence in support of plaintiff's claims. The express language of these disputed contract provisions, once integrated with other provisions noted by plaintiff and then, as a whole, viewed in the context of plaintiff's extrinsic evidence, allows for the jury's conclusions that, inter alia, plaintiff's interpretations of the relevant provisions correctly reflected the contract parties' intentions; plaintiff requested but was wrongly denied the right to offer its services in the "other buildings"; and, plaintiff was entitled to "exclusive access" to the telephone closets so as to make meaningful the bargain contemplated under the agreement.[22]

---

was sufficient to explain these references (even if read as the original product of unartful contract drafting for Sharetech) and does not, in context, make plaintiff's interpretation unreasonable.

22. The contract defendants also complain that, even assuming the existence of two reasonable but competing interpretations of section 1.03, the evidence required that the jury find a failure to contract. There is no reason, however, to believe that the jury failed in its obligation to follow the court's instructions in the law on failure of mutual assent. Indeed, adequate evidence was presented from which the jury could conclude that the contract defendants knew or had reason to know of the meaning attached to this provision by the plaintiff.

In addition, credibility of witnesses and advocated themes go a long distance in some cases and, in this case, must not be underestimated in their overall impact. For example, the contract defendants' performance of even the most obvious of obligations appeared, at best, as grudgingly made. Evidence also was presented from which the jury could properly infer that the contract defendants, by means of subterfuge and/or stonewalling, sought to avoid certain obligations in support of plaintiff's business in violation of the agreement (*e.g.*, BAP affiliates who by-passed the buildings leasing agent (February 7, 1995, N.T. 33, 50)). Pro-defense witness' testimony was frequently combative, at other times vague and forgetful, and occasionally was contradictory. The resultant effect emphasized bias rather than dispassionate factual offerings.

Against the backdrop of admissions relating to the generous intentions of the original owners and "sts" provider and the concomitant spirit in which those parties carried out their responsibilities under the Sharetech agreement, defendants' attacks on the credibility of plaintiff's evidence that the SCS agreement was intended in all significant respects to be an assignment of the Sharetech agreement sounded, for the most part, simply hollow. In short, it does not shock this court's sensibilities that the jury rejected the contract defendants' evidence disputing plaintiff's version of events and/or the intended meaning of certain of the contested SCS contract provisions.

The court also finds that sufficient evidence exists to support the jury's conclusion that BAC and Bell of PA were guilty of a civil conspiracy and acted intentionally and improperly, in the face of knowledge of the terms of the SCS agreement and of the fact that they were interfering with the contract defendants' performance under that agreement, and, further, that their conduct reflected, at the least, a reckless indif-

ference to the rights of plaintiff.[23] See *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979); *Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978); Restatement (Second) of Torts §766 (1979).

The existence of a conspiracy can be inferred from evidence of related facts and circumstances which demonstrate that activities of participants could not have been carried out except as a result of a preconceived scheme or common understanding. *U.S. v. American Investors of Pittsburgh Inc.,* 879 F.2d 1087, 1101 (3rd Cir. 1989). Thus, it is not required that plaintiffs have proved by direct evidence explicit declarations of purpose or words uttered by the parties. *Rumbaugh v. Beck,* 411 Pa. Super. 220, 236, 601 A.2d 319, 327 (1991).

There was evidence in this case to show that BAC's in-house corporate counsel, in very critical ways, participated in the negotiation of the SCS agreement executed on September 9, 1986, and did so in a fashion reflecting the interests of Bell of PA. While this was not, in and of itself, improper, the jury could infer evidence critical to plaintiff's tort claims, including knowledge, unity of interests, and capacity to act in furtherance of common interests. Later, the evidence proves, Bell of PA utilized BAC to gain access to restricted areas in the JFK buildings despite receipt of process in this lawsuit in September 1990, followed by service of the complaint in January 1991. In this fashion, the willingness to act contrary to known obligations, in concert, was laid forth for the jury's consideration. So too was the ability to do so.

Evidence relating to the nature of Bell of PA's CEN-TREX product, its use by Bell affiliates tenanted in the buildings instead of SCS's services (and, in fact,

---

23. Again, defendants make no objection to the court's charge to the jury on these subjects.

dating from as early as 1986), and Ms. Brown's testimony that Mr. Widerman told her that he was experiencing "pressure" on behalf of CENTREX not to honor the "advise" and "recommend" obligations under the agreement, all combined to offer the jury evidence from which intent and purpose could be inferred along with further examples of the means to interfere.

Plaintiff's evidence relating to the purposeful technician disarmament of barriers placed in the telephone closets by Mr. Bentsen certainly permitted, within the context of other evidence, the inferences that (i) it was Bell of PA who removed the plexiglas barrier and disarmed the alarm, (ii) Bell of PA was aware that SCS, by virtue at the very least of Bentsen's actions, was asserting a proprietary interest (*i.e.,* the right of "exclusive access"), and (iii) even if believed to be acting without the specific purpose or desire to interfere, Bell of PA should reasonably have known that interference was certain or substantially certain to occur as a result of its conduct.

The court also finds that the jury was entitled to believe that a corporate philosophy promoting self-interests over known contractual and/or legal responsibilities pervaded the conduct of these tort defendants. Ample trial evidence exists to overcome the defendants' contention that its various actions were never anything more than justified, simple efforts to service potential Bell of PA customers.[24] In this regard, the relationship between and amongst the parties, motive and conduct, and the interests sought to be advanced by the actors, as presented at trial by plaintiff, permit the conclusion reached by the jury that the conduct of the tort defendants was, indeed, intentional, improper and should not be permitted without liability.

---

24. See Comment j, section 766 of Restatement (Second) of Torts (1979).

Finally, the tort defendants' argument that neither punitive damages nor the amount of the awards were warranted by the evidence in this case must be rejected. The jury was entitled to find that defendants acted with a bad motive or reckless indifference to the interest of others. *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985). The argument that the record evidence presents no more than evidence of a breach of contract is simply without merit. In fact, the jury was entitled, based on the evidence, to determine otherwise, and in so doing, took into account the nature of the tort defendants' acts, together with motive, the relationship between the parties and all other attendant circumstances. *Martin v. Johns-Manville Corp., supra* at 170, 494 A.2d at 1096; *Chambers v. Montgomery,* 411 Pa. 339, 345, 192 A.2d 355, 358 (1963). In the court's own view, that evidence demonstrated a relentless effort on the part of BAC and Bell of PA to supplant plaintiff at the 1800 and 1880 JFK buildings.

For these reasons, the court declines to find insufficiency of the evidence.[25]

## (B) Legal Error

As for the defendants' challenges based on judicial error, the court endeavored, whenever possible, to state on the record the basis for its various rulings following argument of counsel, including its decision to leave the interpretation of certain provisions of the contract between plaintiff and the joint ventures to the jury;[26]

25. Other important evidence developed at trial served to bolster plaintiff's proof. The court declines. here to recite the full litany of the evidence beyond that already set forth in the factual background at part I of this opinion, confident instead to rely on the record.

26. No objection has been taken to the court's instructions to the jury regarding the latter's obligations under the law in carrying out this task of contract interpretation.

to admit certain evidence over defense objection; to deny the nonsuit request of tort defendants Bell of PA and BAC on the civil conspiracy and intentional interference tort claims; and to deny the defense proposed points for charge on waiver.

The court has very little to add that would not be repetitious on most of these defense claims. For this reason, the court will address only the most important of the issues raised and/or those where the record may be wanting in explanation:

(1) Whether the jury awards on the tort claims are duplicative of the awards on the contract claims.

Defendants argue that the jury's verdict necessarily duplicated the contract damages in awarding tort damages. Defendants base this contention on their assertion that plaintiff's only evidence of damages was for breach of contract.

Defendants' assertion that the tort and contract damage awards were duplicative per se ignores plaintiff's evidence of damages which the defendants so vigorously sought at trial to cast as consequential and indirect damages precluded on the contract actions under section 14.01 of the SCS agreement (limitation of liability provision) and/or precluded, in whole or in part, on the contract actions for lack of timely written notice under section 17.02 (30-day cure provision). Certainly if the jury found contract breaches on the "other buildings" claims, as it obviously did, but also accepted either or both of defendants' contract preclusion arguments,[27] this same evidence could support the damage verdicts for civil conspiracy and tortious interference.

Defendants have failed to identify anything specific in an analysis of the actual dollar values which tends to convince the court that the tort awards were duplicative of the award made by the jury on the contract

---

27. See discussion at part II, B(4) and (5), *infra.*

claims. The court's charge to the jury carefully described those damages which were legally recoverable under the contract actions and those which were recoverable under the tort actions. Those damages described as consequential and indirect pecuniary losses were identified clearly as not recoverable under the contract claims. Defendants offer no basis on which to conclude that the jury failed to heed these instructions.[28]

(2) Whether Pennsylvania recognizes a civil conspiracy to tortiously interfere[29] existent between two related corporate entities who also bear a corporate affiliation with one of the parties to the underlying contract.

---

28. The court further notes that defendants failed to raise this issue of duplication at trial. The court presented the parties ample opportunity to object to both the jury charge and the verdict sheet. To the extent defendants sought and were refused a line itemization on that portion of the verdict sheet relevant to the contract claims, defendants never expressed to the court a concern of duplication as between possible tort and contract damage awards. For this reason, the court finds a waiver of the duplication claim. *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 114 (1974).

29. The tort defendants complain of judicial error in the court's decision to permit plaintiff to amend its complaint in order to conform with the evidence presented at trial. In so doing, the court analyzed the allegations contained in the complaint and found sufficient elements to make a prima facie case of civil conspiracy. In addition, the court found that the defendants had notice of plaintiff's claim for civil conspiracy and that the amendment therefore was not unfairly prejudicial. (See February 28, 1995, N.T. 179-84; 3-1-95, N.T. 2-5.) Nothing presented on post-verdict motion persuades the court that its trial ruling was in error. See also, Pa.R.C.P. 126: "The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage may disregard any error or defect of procedure which does not affect the substantial rights of the parties."

(a) Plaintiff's conspiracy claim against Bell Atlantic-Pennsylvania and Bell Atlantic Corporation.

Defendants concede that the evidence concerning the RBI incident, more fully summarized elsewhere in this opinion, permits the reasonable inference that BAC instructed its subsidiary, BAP, to allow another subsidiary, tort defendant Bell of PA, use of facilities and that this occurred despite knowledge of plaintiff's express entitlement claims under the contract with the joint ventures. Defendants argue that this evidence is legally insufficient to support a jury finding of conspiracy because a parent corporation always has a legal right to instruct a subsidiary to "protect their interest." (Defendants' brief, p. 16.) In support of this argument, defendants cite *Green v. Interstate United Management Services Corp.,* 748 F.2d 827 (C.A. 3 1984). Defendants also contend that such "officious intermeddling" is non-actionable intra-enterprise conduct, citing *Copperweld Corporation v. Independent Tube Corporation,* 467 U.S. 752, 104 S.Ct. 2731 (1984). (Defendants' brief, pp. 15-19 and their reply brief, pp. 10-11.)

The court is not impressed by these arguments for a variety of reasons, not the least of which is that of pure logic. Plaintiff's complaint is that defendants BAC and Bell of PA conspired to interfere with the contract between SCS and the joint ventures which owned the buildings. Although BAC had a stake in the joint ventures through its subsidiary, BAP, the joint ventures themselves were not a subsidiary of BAC. (Likewise, the joint ventures were not a subsidiary of Bell of PA.) Moreover, the breach of contract conduct complained of in this suit reflects BAP's conduct engaged in as a general partner with MetLife in the joint ventures. See also paragraph 4 of plaintiff's complaint together with defendants' answer admitting the allegations of corporate identity. The signatories to the SCS agreement are SCS, 1800 JFK joint venture (by both BAP and

Metropolitan Life Insurance Company), and 1880 JFK joint venture (by both BAP and Metropolitan Life Insurance Company).[30] Therefore, a rule of law holding that a corporation and its subsidiary or two subsidiaries of the same corporation cannot conspire as a matter of law simply does not apply to this case.

This court is not convinced in the first instance, however, that such a rule of law as stated by the defendants bears any applicability to the underlying tort-based facts developed in this case. To begin, the *Copperweld* case presented the United States Supreme Court with a very narrow issue—"We limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly-owned subsidiary are capable of conspiring in violation of section 1 of the Sherman Act." *Copperweld,* 467 U.S. at 767, 104 S.Ct. at 2739. The *Copperweld* court's analysis is centered on notions about the anti-competitive potential of illegal combinations of firms, not combinations designed to achieve the breaching of contracts.

On the one hand, the tort defendants urged at trial that this was never an antitrust case but, rather, one involving pure contract relations. They succeeded, in fact, in convincing this court that plaintiff lacked standing to sue under the anti-trust laws because plaintiff was unable to prove itself a "target" competitor. Having succeeded on that score, defendants now seek to turn the coin and claim complete immunity from suit for civil conspiracy to tortiously interfere based on federal antitrust law and policy. The *Copperweld* decision by its own language is limited to the construction of the word "conspiracy" as used in section 1 of the Sherman Act.

---

30. The tort defendants do not attempt on post-trial motion to argue that the contract claim made solely against BAP for equipment rental formed the basis of plaintiff's tortious interference claims.

In this regard, the Supreme Court expressed the concern that combinations, contracts or conspiracies between enterprises had such a potent, inherent anti-competitive effect that they automatically required the most intense scrutiny possible under the Sherman Act. *Id.* at 767-69, 104 S.Ct. at 2739-40. In further defining the Act's focus, the court reflected upon the distinction between intracorporate and intercorporate activity, and for that purpose noted that intracorporate activity, though it might have an anti-competitive effect as well, did not pose nearly as great a danger to free competition as did combinations between distinct entities. *Id.* at 769-71, 104 S.Ct. 2740-41. "Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interest, it is not an activity that warrants section 1 scrutiny." "[T]he coordinated activity of a parent and its wholly-owned subsidiary must be viewed as that of a single enterprise for purposes of section 1 of the Sherman Act." *Id.* at 770-71, 104 S.Ct. at 2741.

This court is satisfied that *Copperweld* does not stand for the broad, sweeping generalization which defendants here urge. The *Copperweld* court itself stated: "The appropriate inquiry in this case, therefore, is not whether . . . the term 'conspiracy' will bear a literal construction that includes parent corporations and their wholly-owned subsidiaries. For if these were the proper inquiries, a single firm's conduct would be subject to section 1 scrutiny whenever the coordination of two employees was involved." *Id.* at 776, 104 S.Ct. at 2744.

The tort defendants' reference to *Green v. Interstate United Management Service Corporation, supra,* more properly presents circumstances akin to the instant case. Nevertheless, several key facts distinguish *Green* and, therefore, this court does not find *Green* dispositive of the issues in this case either.

In *Green,* IUM, a subsidiary of Interstate United Corporation and Hanson Industries Inc., sent a letter of intent to enter into a lease to William Green, a commercial real estate developer. *Green,* 748 F.2d at 829. Acting in reliance on the letter, Green, at considerable expense, made arrangements, including financing, and prepared a lease. *Id.* Green submitted the lease to IUM, whose agent orally approved it. *Id.* IUM then submitted the lease to its parent corporations, who then determined based on an independent appraisal that the proposed lease would dissipate IUM's assets. The corporate parents instructed IUM not to sign the lease. *Id.*

The United States Court of Appeals for the Third Circuit held that Interstate United's and Hanson's conduct did not rise to the level of intentional interference with present or prospective contractual relations. In so holding, the court stated:

"Among the factors that the court must examine in a tortious interference case are the 'actor's conduct,' 'the actor's motive,' 'the interests sought to be advanced by the actor,' and 'the relations between the parties.' [Restatement Second] sections 767(a), (b), (d), & (g). We think that these factors are paramount in this case. The conduct complained of here is that Interstate and Hanson instructed their wholly-owned subsidiary not to sign a lease tendered by Green and his associates. Interstate and Hanson intervened after an independent appraiser had determined that the contract was a bad bargain; their motive, plainly, was to prevent dissipation of the resources of their wholly-owned subsidiary. In this case, 'the social interests in protecting the freedom of the actor' outweigh 'the contractual interests of the other.' *Id.* §767(e). We hold, therefore, that the interference by Interstate and Hanson was proper, and will order entry of judgment notwithstanding the verdict in their favor on the interference and conspiracy claims." *Green,* 748 F.2d at 831.

It is clear from this analysis that *Green* is distinguishable. First, the *Green* court could not find the defendants liable for civil conspiracy to tortiously interfere with contractual relations because it did not find the defendants liable for tortious interference with contractual relations. A cause of action for conspiracy will fail absent a cause of action for a particular act in furtherance of whose commission the defendant is said to have conspired. *Pelagatti v. Cohen,* 370 Pa. Super. 422, 432, 536 A.2d 1337, 1341-42 (1987).

Secondly, the nature of the acts by the corporate parents in *Green* is markedly different from those in the instant case. In this case, BAC and Bell of PA are accused of intentionally acting to deprive SCS of its business by securing the breach of the joint ventures' contractual obligations (albeit through BAP) and thereby gain that business instead for Bell of PA. In contrast, the defendants in *Green* were accused merely of instructing a subsidiary to avoid entering an agreement which would dissipate the subsidiary's assets. Where the evidence reasonably supports the jury's finding in this case that the tort defendants acted to take SCS's business, then, unlike in *Green,* the circumstances point to no social interest in protecting the freedom of the actor which should outweigh SCS's contractual rights.

In addition, this court finds ample support under Pennsylvania law for holding that a corporation and its subsidiary are capable of conspiracy. While it holds true that the agents of a single entity cannot conspire among themselves, see *Rutherfoord v. Presbyterian University Hospital,* 417 Pa. Super. 316, 334, 612 A.2d 500, 508-509 (1992), the distinction between a corporation and its subsidiaries remains a legal formality strictly observed by the Pennsylvania courts. In *Sams v. Redevelopment Authority,* 431 Pa. 240, 244 A.2d 779 (1968), our Supreme Court stated: "one cannot choose to accept the benefits incident to a corporate enterprise and at

the same time brush aside the corporate form when it works to their (shareholders') detriment. . . . the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes whichever suits their present economic interest." *Id.* at 245, 244 A.2d at 781.

Our Supreme Court has further directed that the corporate form is to be disregarded in order to defeat fraud or misconduct. See *e.g., Kiehl v. Action Manufacturing Co.,* 517 Pa. 183, 190, 535 A.2d 571, 574 (1987).

In *Kashner v. Geisinger Clinic,* 432 Pa. Super. 361, 638 A.2d 980 (1994), the Superior Court addressed analogous circumstances and held that where a business uses the corporate form for a subsidiary and enjoys the legal benefits thereof, it cannot later argue that the corporate form is merely a facade over the fact that the parent owns the subsidiary and that they should be legally treated as one entity. *Id.* at 369, 638 A.2d at 984. *(Compare, Glazer v. Cambridge Industries Inc.,* 281 Pa. Super. 621, 422 A.2d 642 (1980), where the Superior Court held that the trial court erred when it dismissed a complaint against a corporation on lis pendens grounds. The trial court had found that a suit against the owner of 100 percent of a corporation's stock precluded a second suit against the corporation on similar claims. *Id.* at 623, 422 A.2d at 643. Reversing the trial court, the Superior Court stated: "A corporation is a distinct and separate entity, irrespective of the ownership of the stock, and the fact that one person owns all its stock does not make him and the corporation one and the same." *Id.* at 625, 422 A.2d at 644, citing *Barium Steel Corp. v. Wiley,* 379 Pa. 38, 108 A.2d 336 (1954).)

As further persuasive authority that conspiracies among affiliated entities are possible as a matter of law, this court considered the decision of the United

States Court of Appeals for the Third Circuit in *Shearin v. E.F. Hutton Group Inc.,* 885 F.2d 1162 (C.A. 3 1989). In *Shearin,* the plaintiff proved at trial that three corporations, a parent and two subsidiaries, conspired to employ her in a fraudulent scheme. *Id.* at 1164. The court of appeals upheld the jury's finding that the three companies were liable for conspiracy. *Id.* at 1167. Defendant's argument that *Shearin* is a decision limited in application to RICO[31] cases is not persuasive. If, as the tort defendants contend, *Copperweld* broadly prohibits a conspiracy finding in *any* context based on a parent and a wholly-owned subsidiary, then *Shearin* must be wrong. This court thinks otherwise, however. Cf. *Kiehl v. Action Manufacturing Company, supra.*

The defendants in this case came into being as a result of the antitrust agreement breaking up the Bell telephone system. BAC created the subsidiaries Bell of PA and BAP in strict and careful compliance with the antitrust agreement. Each entity performs distinct operations, under its own management and with its own goals. Without careful and strict delineation and separation between entities, the entities could violate the antitrust agreement.

Having used the corporate formality so successfully to engage in multiple lines of business yet still remain in compliance with the antitrust agreement, defendants now claim that this very corporate formality is a fiction and that the various entities are in reality a single actor. However, this court is persuaded that BAC, Bell of PA and BAP are separate actors, both as a matter of fact and as a matter of Pennsylvania law, and that BAC

---

31. Racketeer Influenced and Corrupt Organizations, 18 U.S.C. §§1961-1968 (1989).

and Bell of PA are legally capable of conspiring to commit an unlawful act.

(b) Whether a corporate parent can "induce" a subsidiary's breach of a contract.

In a related argument, the tort defendants contend that it is not possible, as a matter of law, for a parent corporation to "induce" a subsidiary to breach a contract. Citing *Advent Systems Limited v. Unisys Corporation,* 925 F.2d 670 (C.A. 3 1991) and *Green v. IUM, supra,* defendants contend that a corporate parent holds a "privilege" to interfere with a subsidiary's contractual relations. (Defendants' brief, pp. 15-16; July 7, 1995, N.T. 17-18.)

*Green,* discussed *supra,* stands for the proposition that a parent is not liable for tortious interference when it instructs a subsidiary not to enter a lease which the subsidiary is contractually bound to enter when the parent has determined, through an independent auditor, that signing the lease will cause dissipation of the subsidiary's assets because the lease is a bad deal. *Green,* 748 F.2d at 831.

In *Advent,* the court of appeals applied a similar rationale to prospective contractual relations. Advent Corporation developed a computer program which Unisys Corporation's United Kingdom subsidiary agreed to market in the United States. *Advent,* 925 F.2d at 672. The agreement between Advent and Unisys U.K. was memorialized in two documents outlining the agreement. *Id.* The agreement was to be in effect for two years, during which time the parties were to negotiate a contract. *Id.* Prior to the expiration of the agreement and prior to agreement on a contract, Unisys Corporation instructed Unisys U.K. to cease negotiations and informed Advent of Unisys' intent not to honor the agreement any longer. *Id.*

*Advent* and *Green* simply do not apply to the facts in this case.[32] In both of those cases, the court of appeals decided that a corporate parent did not tortiously interfere with a subsidiary's contractual relations because the parent was justified in instructing its subsidiary not to perform contractual obligations which would dissipate corporate assets. In neither of those cases did the corporate parent instruct the subsidiary to abrogate contractual relations with a third party in order to commence those same relations with another subsidiary of the same corporate parent. In neither of those cases did the corporate parent instruct the subsidiary to ignore its contractual relations with a third party and surreptitiously provide services to a corporate "sibling" and which the subsidiary was contractually bound to deliver to the third party. Lastly, in neither *Advent* nor *Green* was the "inducement" directed at a joint venture in which the subsidiary participated. See *Green,* 748 F.2d at 831; *Advent,* 925 F.2d at 672-73.

In the instant case, there was no danger that the joint ventures (and thereby BAP or BAC) would lose money or otherwise dissipate assets. In fact, the evidence suggested that, one, the "sts" concept would be an advantage in the marketing of the subject properties and, two, that the 1800 joint venture was to receive additional revenues as a result of the $1.25 per square foot rental increase negotiated at the Bell defendants behest. Clearly, the jury's findings in accordance with the evidence was that BAC's purpose in intervening in the joint ventures' affairs was *not* to prevent asset dissipation

---

32. It also should be noted that, as there was no finding of tortious interference in either of these two cases, the court of appeals was not confronted with a valid civil conspiracy count. See *Pelagatti v. Cohen, supra.*

but, rather, to help its subsidiary, Bell of PA, to aggrandize.

While the Third Circuit Court of Appeals' approach to the involvement of a corporate parent in the affairs of its subsidiary is understandable under the circumstances presented in *Green* and *Advent,* that approach is inapplicable to the instant case. In *Advent,* the court stated:

"When discussing interference with prospective contractual relations, the Pennsylvania Supreme Court has not adopted the language of the Restatement (Second) of Torts § 766B (1977) that favors an analysis of 'proper' conduct rather than 'privileged.' See *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971). Thus, privilege is still a matter for consideration in cases of prospective contractual relations. *Silver v. Mendel,* 894 F.2d 598, 601 (C.A. 3), *cert. denied,* 110 S.Ct. 2620 (1990).

"Privilege is closely related to intent, *id.* at 603 n.7, and admits of no precise definition. *When a defendant acts at least in part to protect some legitimate concern that conflicts with an interest of the plaintiff, a line must be drawn and the interests evaluated. Glenn,* 441 Pa. 474, 272 A.2d at 899. The *central inquiry in the evaluation is whether the interference is 'sanctioned' by the ' "rules of the game" which society has adopted [defining] socially acceptable conduct which the law regards was privileged.' Id.*

"[*Green*] is an existing, rather than a prospective contractual interference case but illustrates Pennsylvania law on the propriety of conduct by a parent corporation. There, defendant instructed its subsidiary not to sign a lease tendered by the plaintiff real estate broker after an appraiser had determined that the contract was a bad bargain. Basing our ruling on section 767 of the Restatement (Second) of Torts, which applied in that situation, we held the interference was proper be-

cause the defendant's motive was to prevent dissipation of its subsidiary's resources. '[T]he social interests in protecting the freedom' of the defendant outweighed the plaintiff's 'contractual interest.' *Id.* at 831.

"Here, although plaintiff claims interference with a prospective contractual relationship, we think a similar approach applies. We agree with the [trial] court's reasoning that Unisys' interest in the financial stability of its subsidiary and the need to avoid a situation where the two would be working at cross-purposes justified the disruption of negotiations with Advent." *Advent,* 925 F.2d at 673 (emphasis added).

This court concludes that the answer to the "central inquiry" available to the defendants in both *Advent* and *Green* is not available to BAC or Bell of PA in this case. The tort defendants were not acting to protect a "legitimate concern" and their actions were, therefore, not privileged, "socially acceptable conduct."

(3) Admissibility of evidence.

Defendants assert as additional grounds for the right to a new trial numerous evidentiary rulings which are characterized as erroneous and prejudicial. To be sure, the challenged evidence was of no benefit to defendants;[33] however, the record adequately reflects the court's determination of probative value in each such instance.[34] The court declines, therefore, the opportunity

---

33. In the case of the objection to the court's refusal to permit defendants the right to elicit testimony from tenants who, as SCS customers, purportedly experienced instances of unpleasant business dealings, there was no legitimate purpose for such evidence of specific bad acts, purely collateral in nature, and only would have served to further entangle the jury and lengthen what was well on its way to becoming for the jury an interminable trial.

34. The court also adopts plaintiff's thorough analysis of the record set forth in its memorandum of law in opposition, pp. 35-46, including the basis for the court's refusal to strike the testimony of plaintiff's expert witness, Don Woods.

for an expansive treatment of the basis for its decisions in what amounts to virtually every evidentiary ruling made against defendants over the course of a five-week trial.

Certain of defendants' claims are patently frivolous, such as the challenge to Ms. Brown's testimony concerning her conversation with Tony Lordi about section 1.03. The jury was cautioned as to its limited purpose in revealing the witness' "state of mind" (February 10, 1995, N.T. 105-110) and later heard directly from Mr. Lordi himself (whom defendants' characterize in their brief as "a witness for the defense"). (February 22, 1995, N.T. 37-42.) This is a classic example of the exercise of the court's broad discretionary powers to allow probative evidence on a point placed in issue by defendants (*i.e.,* whether SCS sat on its rights without any real intention of pursuing new business and/or whether its inaction in formally noticing a breach of section 1.03 of the SCS agreement was because its claimed interpretation of that provision at trial was nothing more than a recent fabrication) while, at the same time, strictly limiting by way of cautionary instruction the permissible scope within which the jury was bound to consider the evidence. (See February 10, 1995, N.T. 110.)

Moreover, in most, if not all, instances where error and prejudice are now claimed, the jury received adequate cautionary instruction and defense witnesses later testified in turn to explain or clarify the challenged evidence. On this latter point, not only did Mr. Lordi expressly refute Ms. Brown's assertion of the basis for her "state of mind," but the jury was treated to Mr. Albertini's testimony at trial in explanation of his deposition testimony (see February 24, 1995, N.T. 52-54);[35] Mr. Martin explained in great detail the back-

---

35. Defendants complain that the admission at trial of certain pre-trial deposition testimony by William O. Albertini, vice-president

ground leading to both the March 7, 1991 stipulation and order and the November 22, 1993 TRO (see February 28, 1995, N.T. 24-37); and so on.

The record could not be clearer on the subject of the admissibility of the redacted version of the stipu-

---

and chief financial officer of BAC, caused undue prejudice and requires the grant of a new trial. The testimony read to the jury was, as follows:

"Question: And if a determination is made not to honor your obligations?

"Answer: I assume that would have been based on legal reasons or sound business judgment.

"Question: Or what? I'm sorry:

"Answer: I said either sound business judgment or legal reasons."
See February 8, 1995, N.T. 217-18.

The court overruled trial counsel's objection to the admissibility of this evidence based on its probative value to the issue of tort defendant BAC's thought process at the very highest of corporate levels. It clearly was relevant as well to plaintiff's other evidence that tort defendants BAC and Bell of PA knowingly and intentionally acted in concert to induce the joint ventures to breach the "exclusive access" provisions of the agreement. In this regard, in describing an incident referred to by the parties at trial as the "RBI incident," Mary Quain of BAP previously had testified to an intervention on behalf of Bell of PA made by Mr. Albertini, whom she likened to "God," and about whom she noted the extraordinary nature of any contact he might make with someone in her position:

"Question: I just want to make it clear. Somebody at Bell Atlantic Corporation made the decision that it would be—that your statement [to plaintiff promising that Bell of PA would not be permitted in the telephone closets over the weekend, in accordance with plaintiff's interpretation of the March 7, 1991 stipulation and order binding upon all of the parties] would be overridden?

"Answer: That's right.

"Question: And somebody at Bell Atlantic Corporation then conveyed that on to Mr. Maguire [Quain's boss]?

"Answer: To the best of my knowledge.

"Question: Where did you get any knowledge as to that fact?

lation and order. (Plaintiff's exhibit no. 233.) Ample argument was permitted over the course of several different days before the court finally ruled. In the exercise of its broad discretionary powers in such matters, great care was taken by the court to protect the legitimate but competing interests of the parties, including by way of the court's incantation of a precisely drawn cautionary instruction which was made to the jury on each occasion that the stipulation was referenced. (See *e.g.,* February 9, 1995, N.T. 19-35, 74-75; March 6, 1995, N.T. 158-59.)

---

"Answer: Well, I had a phone call after I got home from work Friday night from Clair Zaff, who was our human resource person, telling me I would be getting a call from Bill Albertini from Bell Atlantic Corporation in reference to the situation, and she wanted to make sure that I wouldn't—that I wouldn't say, sure, it's Bill Albertini, clunk, and treat the call with the respect that it should be treated with. And she wanted to make sure I knew who he was.

"Question: Who was Mr. Albertini?

"Answer: He is next to God. [. . .]

"Question: . . . [I]s it unusual for someone at Mr. Albertini's level to be calling you?

"Answer: Yes, extremely.

"Question: How about to be calling Mr. Maguire?

"Answer: Extremely. [. . .]

"Question: Did . . . anybody tell you why somebody so important was placing this call?

"Answer: Just somebody knew somebody, and it worked its way up." (February 8, 1995, N.T. 197-202. See also, February 24, 1995, N.T. 138-43.)

Mr. Albertini's deposition testimonial evidence also was corroborative of plaintiff's trial evidence that BAC acted outrageously.

In summary, its relevance and probative value outweighed any prejudice to defendants on account of the context in which defendants claim Mr. Albertini spoke at the time of his deposition. Again, his availability at trial to offer an explanation of his intended meaning by those words (as well as the opportunity to deny Quain's testimony) was the means to counter-balance the plaintiff's evidence.

In challenging the admissibility of evidence relating to the TRO, defendants neglect to acknowledge that, despite the court's generous initial ruling to exclude this evidence, defendants quite consciously opened the door to its use during cross-examination of Ms. Brown.

In summary, the court remains unpersuaded that the challenged evidence was admitted improperly or under circumstances causing undue prejudice to defendants.

(4) Whether damages on sections 1.01 and 1.03 constitute non-recoverable consequential damages under section 14.01 of the agreement.

The contract defendants also assert that the court erred in refusing to grant their motion in limine and motion for nonsuit based on section 14.01 of the agreement,[36] which provides:

"14.01 *Limitation on liability.* None of the parties shall be liable to the others for any incidental, indirect or consequential damages arising out of this agreement."

Specifically, defendants challenge the court's determination not to instruct the jury that, as a matter of law, plaintiff was barred by section 14.01 from recovering any contract damages for a proven breach either of sections 1.01 or 1.03. The court declined based on the conclusion that if plaintiff's interpretation of those ambiguous provisions was found by the jury to be correct, and the jury determined as well based on the factual evidence that the claimed damages were foreseeable, recovery would be a reasonable possibility.

The court remains of the view that the issue was one for determination by the jury and that, in any event, the outcome of the trial was not adversely affected by this decision. In this regard, the jury was instructed

---

36. Before and during trial, the court carefully considered this issue and heard argument on it. In addition, this issue was raised before Judge Goldman of this court as a motion for summary judgment. Judge Goldman denied the motion.

generally on the meaning and application of section 14.01 of the agreement:

"In addition to these instructions which I have just given you on the law applicable to damages for breach of contract, you must also know that in connection with plaintiff's claim for breach of contract against the contracting defendants the agreement provides at section 14.01 that plaintiff is not entitled on its breach of contract claim to recover consequential or indirect damages for any proven breach. Therefore, if but only if you determine that the contracting defendants breached their obligations to plaintiff under the agreement, you must also determine before assessing an amount of damages for any particular proven breach whether as a factual matter the harm claimed by plaintiff under such provision was a reasonably foreseeable result of the contracting defendants' conduct. In other words, you must determine whether as a matter of fact the harm claimed by plaintiff flowed directly and immediately from the acts of the breaching party so as to constitute direct rather than consequential damages.

"If you find that the harm claimed by plaintiff was not reasonably foreseeable and, therefore, direct and immediate result of the breach of that particular provision of the agreement, then the harm was indirect and consequential and is not recoverable by plaintiff." (March 6, 1995, N.T. 165-66.)

The damages at issue relate to plaintiff's claim of lost profits resulting from the contract defendants' failure to honor the provisions of the agreement entitling plaintiff to offer "sts" to tenants of the "other buildings" pursuant to sections 1.01 and 1.03.

Before submitting the matter to the jury, the court found that the testimony presented by plaintiff during the trial clearly made the issue of consequential damages one of fact. Plaintiff presented testimony which established that it was the intent of the parties, when

negotiating the SCS agreement, that SCS be given an opportunity to market and provide its services to tenants of 1800 and 1880 JFK as well as to tenants of the "other buildings." This included plaintiff's evidence relating to Mr. Lordi's enthusiasm for "sts," his attempts to negotiate an exclusive provision arrangement with Sharetech, the parties' intention to assign the Sharetech agreement to SCS "as is" (except for the concession fee clause), and Mr. Lordi's inquiries to SCS regarding the latter's capacity to expansively provide service well beyond the requirements of the 1800 and 1880 JFK buildings. Defendants sought at trial to refute all of this evidence.

The court found it was properly a question for the jury to decide whether the damages claimed by plaintiff as a result of these claimed breaches were, therefore, a direct result of the contract defendants' default. In so holding, this court found Judge Gorbey's reasoning in *Seidel, Gonda & Goldhammer v. Master Data Center Inc.,* 438 F. Supp. 80, 82 (E.D. Pa. 1977), applicable to the instant case:

If the jury found that the parties to the SCS agreement intended plaintiff (short of substandard performance) to have an absolute right to offer its services in the "other buildings" and, further, that they intended under section 1.03 for all of the key access provisions (such as the "advise" and "recommend" provisions) to automatically apply to the "other buildings" which could be serviced from the Resource Center, and, if the jury also found that the quid pro quo for the $1.25 increased rental on the Resource Center (as well as other contemplated capital expenditures) included plaintiff's expectations of profits from these "other buildings," then the jury could reasonably find that the defendants' refusal to provide SCS any access to those tenants caused direct, foreseeable damages. On the other hand, the jury also was free to find, as defendants argued to

the jury, that plaintiff's claim that it negotiated for this right was false.

The court is convinced as well that the outcome of the trial was not adversely affected by the decision to submit the issue of consequential damages to the jury. In this regard, plaintiff's expert witness, Stephen E. Siwek, testified that plaintiff suffered lost profits damages in the amount of $111,000,000 as a result of the contract defendants' "other buildings" breaches. (See plaintiff's exhibit no. 231.) In sharp contrast, Mr. Siwek's lost profits damages evidence as a result solely of the 1800 and 1880 JFK building breaches totalled only $3,918,788. *(Id.)*

The jury found that, indeed, these defendants breached the sections 1.01 and 1.03 obligations, along with the several other provisions relating solely to the 1800 and 1880 buildings, but, in conclusion, the jury found that the harm suffered "as the direct result of the breaches of contract by defendants" totalled just $2,978,000. (See jury verdict sheet at pp. 1-2.) Simply because the jury found that the evidence proved a breach of sections 1.01 and 1.03 does not require the conclusion that the jury also found that plaintiff was entitled to recover damages arising from those particular breaches on the contract action. The dollar values reflected in the verdict sheet, in fact, suggest the very opposite.

The jury received extensive instructions regarding the issue of damages, including what constituted direct damages, and under what causes of action it could award consequential damages. Defendants do not take issue with the court's instructions on these subjects and present nothing to persuade the court that the jury failed to properly apply the law to the evidence presented.

Indeed, nothing presented to this court on post-trial motion convinces the court that the jury failed to follow the instructions relating to the type of damages recoverable under the agreement, that the jury's findings

of a breach of sections 1.01 and 1.03 is inconsistent with a possible further finding by the jury that Siwek's $111,000,000 "other buildings" damages were not foreseeable, or, that the jury's contract damages award of $2,978,000 is not supported by the evidence.

Neither the court's decision to submit the issue of the directness of the damages to the jury nor the jury's findings are erroneous.[37]

(5) Jury charge on waiver.

The contract defendants requested at the court's charging conference that Pennsylvania Standard Civil Jury Instruction no. 15.11 be submitted to the jury on the theory of an implied waiver.[38] This standard instruction

---

37. In any event, since section 17.02 entitles plaintiff to recover *any* damages, at law or in equity, for a continuing default following written notice, the record evidence is undisputed that defendants failed to cure despite written notice of certain breaches made by way of plaintiff's counsel's correspondence in June 1989, May of 1990 and October 1990, as well as at the time of service of the complaint initiating this suit. Defendants' failure to reconcile the "any damages" language in section 17.02 with section 14.01 under these circumstances is a fatal flaw in their argument. Section 17.02 does not state that no suit may be filed until after written notice is served and the "cure" period has elapsed. Since contract defendants took no steps to cure their defaults under the SCS agreement even after written notice, plaintiff was not limited by section 14.01 to the recovery of any consequential damages whatsoever (assuming the jury awarded any). See also, this court's discussion of the import of section 17.02 of the agreement, *infra*.

38. The standard instruction reads:

"A party may waive, or give up, its contract rights. A party who sanctions or fails to protest the breach of a contract waives its right to recover for a breach of that contract. That party also cannot recover damages for non-performance or use breach as a defense in a lawsuit on that contract. A breach of contract may be waived either by implication or by express agreements. The party waiving a breach must know about the breach at the time of the waiver." No. 15.11 (CIV) Waiver of Breach—Generally.

requires, however, that there be evidence for the jury's consideration that defendants were misled and prejudiced by plaintiff's alleged conduct implying a waiver of a breach of sections 5.05, 1.03 and/or 1.01: "[T]he doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby . . . .*" (emphasis in original) *Brown v. City of Pittsburgh,* 409 Pa. 357, 360-61, 186 A.2d 399, 401 (1962); *Consolidated Rail Corp. v. Delaware & Hudson Ry. Co.,* 569 F. Supp. 26, 29 (E.D. Pa. 1983) (applying Pennsylvania law). On account of the absence of any such evidence at trial, the court declined to submit an instruction on implied waiver.

On post-trial motion, contract defendants continue to argue, through references to the trial record, that sufficient evidence exists to have presented the jury with the question of whether or not plaintiff's conduct implied a waiver of the contract breaches. Nowhere, however, do defendants suggest that they were misled or prejudiced on account of that alleged conduct.[39] The court remains convinced that an instruction on implied waiver was not warranted by the evidence.

Contract defendants contend, in the alternative, that a new trial is required because of the court's failure

---

39. Indeed, the defense which was presented at trial focused on contract defendants' insistence that plaintiff's interpretation of the disputed contract provisions was plainly wrong. In this fashion, the record supports the conclusion that even had plaintiff done all that contract defendants say it did not do *(e.g.,* specifically complained on a timely basis), contract defendants still would have persisted in a refusal to permit SCS the opportunity to offer its services in the "other buildings" and still would not have required the 1800 and 1880 JFK tenant-affiliates to subscribe to plaintiff's services on account of contract defendants' differing interpretations of the disputed contract provisions.

to charge the jury, as a matter of law, that pursuant to section 17.02 of the agreement, "there can be no recoverable damages until after notice of an alleged breach has been sent to the contract defendants by plaintiff." The contract defendants also contend that, assuming *arguendo,* the court found section 17.02 ambiguous, then it should have instructed the jury to interpret the provision. (Defendants' motion, ¶ C.2. and 3. at p. 12.)

Section 17.02 of the agreement provides:

"If manager or owner defaults in any of its obligations under this agreement and such default shall not be cured within 30 days after written notice from SCS, or if such default cannot be cured within such 30 day period and owner does not commence to cure such default within such 30 day period and diligently prosecute such cure to completion thereafter, SCS shall be entitled to any damages, rights or remedies at law or in equity."

The court neither concluded that section 17.02 was ambiguous nor that it was any more necessary to instruct the jury on the plain meaning of this provision than it was to give legal instruction on each and every provision of the agreement. The jury was in possession of the agreement, marked as plaintiff's exhibit no. 13,[40] and, in the course of its deliberations, was free to review all of the provisions highlighted by the parties as relevant, including section 17.02 (to which defense counsel repeatedly referred during his closing argument). Moreover, the jury did receive instruction from the court regarding the importance of its consideration of the document as a whole.

In point of fact, had the court given legal instruction to the jury on the unambiguous, legal meaning of section 17.02, the instruction would not have aided defendants. It is the court's view that the restrictive interpretation

40. See March 7, 1995, N.T. 2.

of section 17.02 advanced by defendants is unreasonable and not supported by the express language of that provision.

Nowhere does this provision state that absent written notice, SCS is foreclosed from seeking the recovery of direct damages.[41] Instead, section 17.02 acts to modify section 14.01, which is the limitation of liability provision. In the event of a failure to cure following receipt of written notice of a breach, section 17.02 broadens the type of damages recoverable under the contract *(e.g., "any* damages, rights or remedies at law or in equity"), and thereby permits the recovery of consequential and/or incidental damages which the contract elsewhere precludes pursuant to section 14.01. In this fashion, otherwise "nonforeseeable" damages come squarely into view.

This conclusion is buttressed upon a reading of section 19.02 of the agreement, which provides:

"The waiver by any party of the noncompliance of the other party with any obligation or responsibility herein shall not be deemed a waiver . . . of remedies for such noncompliance."

Curiously, defense counsel (incorrectly) argued in his closing to the jury that the evidence proved a failure on the part of plaintiff to send any written notice to the contract defendants of a breach of sections 5.03 or 5.04 prior to initiation of this lawsuit by summons. Mr. Martin of BAP admitted in his trial testimony, how-

---

41. Indeed, to the extent that the complaint (together with a copy of the agreement) was filed in January 1991 and the contract defendants persisted, right through to the time of trial in 1995, in certain conduct which plaintiff asserted was in breach of the agreement, nothing in section 17.02 would prevent the recovery of damages for that four-year period.

ever, that he made a conscious decision, following consultation with MetLife (as well as counsel for BAC), that sections 5.03 and 5.04 were not to be honored and, for a time, the contract defendants neither "advised" nor "recommended."

It is, indeed, unreasonable to attempt to read section 17.02 as a bar to the recovery of direct damages on account of a knowing and intentional breach of those clear obligations because plaintiff (supposedly) did not send a written notice telling the contract defendants what they already knew. The evidence reflects other instances as well where the failure, or refusal, to fulfill obligations under the agreement (such as the obligation of 1800 and 1880 JFK Bell affiliate tenants to subscribe to SCS services pursuant to section 5.05 of the agreement) was based on an unalterable intractability on the part of the contract defendants and *not* because they were without notice of plaintiff's interpretation of that provision.

Finally, nothing presented on post-trial motion persuades the court that the outcome of the trial was affected by the failure to instruct the jury as requested by the defendants. As noted above, the jury was in possession of the express language of section 17.02; defense counsel offered ample argument, without objection, regarding the impact of section 17.02 on plaintiff's right to recover damages, specifically referencing the dates and subjects of plaintiff's counsel's notice letters (all marked as trial exhibits); the court did not instruct the jury on section 17.02 in a manner which contradicted defendants' proffered interpretation; the jury's contract damages award of $2,978,000 in no way can be interpreted as including plaintiff's $111,000,000 damages evidence for the "other buildings" breaches; and the jury's contract award, more likely than not, reflects a reduction calculation by the jury against plaintiff's $3,918,788 damages evidence for the "1800 and 1880

JFK buildings" breaches. (See plaintiff's exhibit no. 231.)

For all of the foregoing reasons, the court finds that the refusal to instruct on section 17.02 was proper and, in any event, does not constitute error requiring a new trial.

## PART III: DEFENDANT 1800 JFK JOINT VENTURE'S COUNTERCLAIM FOR RENT

The joint venture's counterclaim against plaintiff for unpaid rent on the space occupied by SCS for the period June 1991 to the date of trial was based on a written lease agreement between these two parties which provides, in relevant part, that the annual fixed rent for the lease renewal period beginning April 1990 was to be the fair market value of the leased premises on that date (plus $1.25/square foot and certain other established sums such as real estate taxes, use and occupancy tax, etc.); if the parties could not agree on a fixed (or base) rental amount, the matter was to be submitted to final and binding arbitration; and, interest was to be paid on overdue rental at a rate defined as "equal [to] . . . 3 percent per annum over the prime interest rate announced from time to time by the largest commercial bank whose principal office is located in Philadelphia or Montgomery County, Pennsylvania as being its prime interest rate charged to its most credit-worthy commercial customers on 90-day unsecured loans." See plaintiff's exhibit no. 14; February 28, 1995, N.T. 52.

Further evidence was adduced at trial demonstrating that the landlord's fair market value quotation to SCS, made in May 1990, was $22.53/square foot, in reply to which SCS placed the value at $20/square foot. At first, SCS requested arbitration, but as the parties could not agree on a mutually acceptable arbitrator, the matter was left unresolved.

Contemporaneous with the filing of the summons in this action in September 1990, SCS wrote to the landlord and offered to recommence negotiations on the base rental amount. In December 1990, SCS wrote again, demanding arbitration on the subject. The complaint in this action was filed in January 1991 and, rather than proceed to arbitration, the joint venture elected to resolve the matter by way of counterclaim to plaintiff's suit on the SCS agreement.

The jury returned a verdict in favor of the joint venture and awarded $397,593 in past due rental. This total amount for the period claimed included a finding by the jury of $20/square foot as the fair market value on the leased premises.

On post-verdict motion, the joint venture asks that the court mold the verdict to reflect an award of "overdue interest," in accordance with its trial evidence, in the amount of $83,068.51. See defendant's exhibit no. 249. SCS opposes this request on two grounds: the jury was entitled to find that the "due date" from which the "overdue interest rate" was to be calculated simply never occurred; and, insufficiency of the evidence establishing an "overdue interest rate."

The threshold issue presented is whether, because the obligation to pay interest was established and defined by contract, the court is precluded from amending the verdict. Indeed, a court may not, under the guise of amending a verdict, invade the exclusive province of the jury. *Cummings v. Ventura,* 174 Pa. Super. 429, 101 A.2d 166 (1953). Nevertheless, it has long been the common law in Pennsylvania that in a contract action, where the damages sought are readily ascertainable by computation, the jury lacks discretion to award prejudgment interest. *Palmgreen v. Palmer's Garage Inc.,* 383 Pa. 105, 117 A.2d 721, 722 (1955). This is true, regardless of whether the creditor's demands were in excess of the amount due *(West Republic Mining*

*Co. v. Jones & Laughlins,* 108 Pa. 55 (1884)), and even when no demand for payment has been made *(McCornack v. Sharples,* 254 Pa. 541, 99 A. 155 (1916)). The fact that a jury reduces a creditor's claimed damages does not render the claim an unliquidated one on which interest does not accrue. *Oxford Manufacturing Co. Inc. v. Cliff House Building Corp.,* 224 Pa. Super. 387, 389, 307 A.2d 343, 345 (1973). Interest accrues either at the legal rate or at the specific contract rate agreed upon by the parties. *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa. Super. 14, 35-36, 473 A.2d 584, 595 (1984); *In re Rorie,* 98 B.R. 215 (E.D. Pa. 1989).

Guided by these principles, the court concludes that it is, in fact, required to grant the relief requested, assuming SCS's two legal objections on the contract proofs are found to be without merit.

SCS contends that the landlord's election to assert its rights by counterclaim in this action rather than by arbitration acted to defer the "due date" until the jury announced the amount of the annual base rent. (Plaintiff's memorandum in opposition, p. 25.) The court does not agree.

Nowhere does the lease state that the "due date" is established as of the date of an arbitrator's award. The amount of the new base rental always was defined as the fair market value of the occupied premises as of April 10, 1990. That amount, despite a possible excessive demand from the landlord, was ascertainable and clearly was due under the lease on a month by month basis, together with the uncontested additional amounts of $1.25/square foot and the other uncontested monthly charges. As previously noted, Pennsylvania does not recognize a bona fide contest of the amount due as an impediment to the obligation to tender on a timely basis. *Burkholder v. Cherry,* 414 Pa. Super. 432, 435, 607 A.2d 745, 747 (1992).

SCS's argument characterizing the election to proceed by way of counterclaim as an "ambush whereby [the joint venture] can receive . . . a default rate of interest" (plaintiff's memorandum of law, p. 25) is especially lacking in appeal where SCS failed even to tender the uncontested amounts on a timely basis.[42]

It cannot be doubted that the joint venture was deprived the use of its money and, conversely, SCS has for that period had the use of the money now known to have been the landlord's. *Burkholder v. Cherry, supra* at 436, 607 A.2d at 747, citing *Frank B. Bozzo Inc. v. Electric Weld Division,* 345 Pa. Super. 423, 430, 498 A.2d 895, 898 (1985).

The sole evidence presented on the amount of the "overdue interest rate" as defined under the lease was Mr. Martin's testimony that the interest rates appearing in defendant's exhibit no. 249 and on which the claim for interest was based, developed as follows:

"Q. Do you know how the interest figures on the summary chart [D-exhibit no. 249] were calculated?

"A. An employee at my direction researched the prime interest rate, I believe at First Fidelity Bank during the relevant periods and so calculated." (February 28, 1995, N.T. 58.)

SCS presented no evidence contradicting the method used to determine these rates nor the rates themselves. The court finds that the joint venture's uncontested evidence, while perhaps not of the highest quality, was not so indefinite as to require the jury to speculate on an amount. The challenge based on sufficiency of the evidence is therefore rejected.

---

42. Moreover, the evidence does not support SCS's claim that it was the landlord alone who refused to proceed with arbitration. The evidence suggests it was Ms. Brown's insistence on non-contractual restrictions in the selection of an appropriate, neutral arbitrator which caused the initial stumbling block to arbitration.

## PART IV: PLAINTIFF'S BREACH OF CONTRACT CLAIM AGAINST BELL ATLANTIC PROPERTIES FOR UNPAID TELEPHONE RENTAL CHARGES

The jury's award to plaintiff for telephone equipment and service charges incurred by BAP is challenged by defendants on the grounds that (i) there never existed a contract between SCS and BAP for equipment rental, but (ii), even assuming the existence of any such contract, the terms proffered by plaintiff, and especially the claimed rate of interest on unpaid charges, are commercially unreasonable and, therefore, void.

Beginning with defendants' latter contention, the court finds a waiver of the issue for failure to assert until now the legal defense of commercial unreasonableness. *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 322 A.2d 114 (1974). BAP contends that this issue was preserved as a result of the parties' request for an instruction on the duty to act in good faith and to deal fairly.[43] The court does not agree, however, that the "good faith/fair dealing" request was synonymous with an instruction regarding commercial unreasonableness or usury. The former applies to the manner of performance while the latter applies to the nature of the contract terms themselves. Moreover, the issue as currently presented raises the spectra of a legal rather than factual bar to recovery and defendants never articulated any such claim to the court.

---

43. The court gave the requested instruction, as follows: "The law imposes upon all parties to a contract in connection with their performance under that contract the duty to act in good faith and to deal fairly, and this duty is recognized under the law even if the duty of good faith and fair dealing is not expressly written as a provision of the contract." (March 6, 1995, N.T. 153.)

Turning to the issue of insufficiency of the contract evidence, defendants concede that BAP was (and is) obligated to use SCS for telecommunications in the management office pursuant to the SCS agreement. The acknowledged agent of the 1800 and 1880 joint venture, Mary Quain, executed plaintiff's master shared tenant services agreement, "MSTSA," on October 28, 1991. (Plaintiff's exhibit no. 172; February 8, 1995, N.T. 113.) Paragraph 1 of the agreement states that it is effective upon execution and, further, that either party may terminate upon 30 days written notice. Paragraph 2 provides for the payment of a late charge of 2 percent per month for balances outstanding in excess of 10 days.[44] Paragraph 4(a) provides that lease terms for any equipment would be established by executed orders. Paragraph 15(j) provides that "this agreement shall apply and be binding with respect to all orders placed by tenant with SCS since October 28, 1991."

SCS and Pitcairn (for the manager) had an executed order (or lease) for the telephone and equipment rental which began in September 1986 and constituted a five-year commitment which rates reflected a discount on account of the long-term commitment. That order expired upon Pitcairn's release by BAP. Once BAP assumed direct responsibility for building management on or about January 1990, however, it refused to execute a new five-year lease for the equipment. Therefore, SCS charged BAP rent on the equipment on month-to-month terms, rather than on the more advantageous, lower rates provided under its five-year lease basis. BAP refused to pay the bills as presented but, instead,

44. As noted elsewhere in this opinion, the parties to a contract may agree to a higher or lower interest rate than the legal rate of 6 percent established for overdue contract payments under 41 Pa. C.S. §202. *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa. Super. 14, 36, 473 A.2d 584, 595 (1984); *In re Rorie,* 98 B.R. 215 (E.D. Pa. 1989).

384

unilaterally re-calculated each bill to reflect the more favorable rental rates available under the five-year lease and made payments to SCS on that basis. Ms. Quain acknowledged that, in the absence of a signed order for equipment rental which would have fixed the leasing period for five years at the established lower rate, SCS's rental charge applicable to all of its customers was the higher month-to-month rate. SCS began charging the MSTSA overdue interest on the unpaid balances.

The MSTSA document, signed by an authorized representative constituted the contract between the parties. The signature of a party or a party's agent on an unambiguous contract is clear and binding evidence of the party's intent to be bound by the terms of that contract. See *e.g., Petrie v. Haddock,* 384 Pa. 7, 119 A.2d 45 (1956). The court concludes that plaintiff's evidence on the existence of a contract was sufficient to support the jury's verdict.

Defendants further assert on post-verdict motion, "BAP has paid the five-year rate every month and has satisfied its obligation under an implied contract." (Defendants' brief, p. 27.) Obviously, the jury did not agree that BAP was entitled to the benefit of the long-term rental rate while at the same time acting in avoidance of the obligations of the five-year commitment. The court finds nothing so shocking in this conclusion based on the evidence as would warrant the entry of judgment n.o.v.

ORDER

And now, March 1, 1996, the motion for post-trial relief of defendants Bell Atlantic Properties Inc., Metropolitan Life Insurance Co., 1800 JFK joint venture, 1880 JFK joint venture, Bell Atlantic Corporation and Bell Atlantic-Pennsylvania is hereby denied, except that with respect to the counterclaim of 1800 JFK joint venture, the jury's award is molded to reflect an award of "overdue interest," in accordance with the trial evidence, in the additional amount of $83,068.51.